INCORPORATION OF RAILROADS UNDER STATE STATUTES.

Cuyahoga County Court of Insolvency.

NEW YORK, CHICAGO & ST. LOUIS RAILROAD COMPANY V. CARL A. BLACK, TRUSTEE ET AL.

Decided, 1927.

*Railroads—Province of Federal and State Law In Incorporation of —Federal Law Dominant Over Interstate Commerce—But Control Over the Instruments of Such Commerce Is Retained By the States—Interpretation of Paragraph 6 of Section 5 of the Transportation Act.*

1. Paragraphs 2 to 6, inclusive of Section 5, of the Interstate Commerce Act (enacted under the title of the Transportation Act of 1920), are statutes of relief against federal and state antitrust laws and are not statutes of prohibition.

2. The consolidations contemplated by paragraph 6 of Section 5, can not be effected unless and until the adoption by The Interstate Commerce Commission of the complete plan provided for in paragraph 5 of Section 5.

3. The legislative history, as well as the language of the entire .section, clearly indicates that Congress did not intend to occupy the field of corporate organization of railroad companies, but on the contrary, left intact the power of the states to create and incorporate railroad companies even though engaged in interstate commerce.

4. The Interstate Commerce Commission having construed said section and having since followed and re-affirmed such construction, state courts, in the interest of uniformity, should lean in favor of such construction.

*W. A. Colson; Boyd, Cannon, Brooks & Wickham; Tolles, Hogsett & Ginn,* for plaintiff.

*John G. White, Judge F. A. Henry, Snyder & Snyder, Frank Scott, Klein, Harris & Diehm, Payer, Minshall & Karch, B. D. Nicola, Stearns, Chamberlain & Royon, Stanley & Horwitz,* for defendant.

EASTMAN, J.    The plaintiff, the New York, Chicago and St. Louis Railroad Company, filed a petition against Carl A. Black, Trustee, et al., defendants, for the condemnation of property described in the petition, and a preliminary hearing was begun as required by law, to determine the right of plaintiff to exercise the power of eminent domain.

The preliminary hearing proceeded, with the plaintiff offering in evidence an agreement and articles of consolidation, made and entered into on the 28th day of December, 1922, by and between the New York, Chicago and St. Louis Railroad Company, the Chicago & State Line Railroad Company, the Lake Erie & Western Railroad Company, the Fort Wayne, Cincinnati & Louisville Railroad Company, the Toledo, St. Louis & Western Railroad Company, also by and between the representative boards of directors of each of the several companies above named and the boards of directors of each of the other said companies for the consolidation of said companies into one corporation, to be known as the New York, Chicago & St. Louis Railroad Company, known as Plaintiff's Exhibit 1; and application of the New York, Chicago & St. Louis Railroad Company for a certificate of public convenience and necessity authorizing acquisition and operation of certain lines of railroad and for authority to issue capital stock, known as Plaintiff's Exhibit 2, and certain testimony as to corporate records of plaintiff company.

During the cross-examination of plaintiff's witness C. C. Collister, defendants asked the following question:

"Q.    Did any of these companies make application to the Interstate Commerce Commission for authority to

make the consolidation, any of the companies of which you were secretary or assistant secretary?

"A.   They did not.

"Q.   But none of the companies that entered into the consolidation ever made application to authorize the consolidation, to the Interstate Commerce Commission?

"A.   They did not.

"Q.   And all the operating companies were engaged in both intrastate and interstate commerce?

"A.   They were so far. as I know, yes."

And the following question was asked of plaintiff's counsel:

"Q.   Isn't that so, Mr. Boyd, that so far as that goes, you don't expect to try to prove that you have ever had any other authorization of the consolidation by the Interstate Commerce Commission, than such as may be implied from Exhibit 2?

"Mr. Boyd: From the exhibit that is already offered."

Whereupon a motion was made by the defendants that the petition of plaintiff be dismissed, "for failure to prove the existence of the corporation; and not only for. the failure to prove, but upon admitted facts, the absolute impossibility of proving by any other set of facts that any corporation *de jure* exists," defendants intending by said motion to raise the issue of whether or not the granting of the application of the plaintiff company, Plaintiff's Exhibit 2, was sufficient to constitute it a *de jure* corporation having the power and right of eminent domain, or whether, in addition to complying with the Ohio statutes in respect to incorporation and consolidation, it was required, as a condition precedent thereto, to make application to and secure the approval of the Interstate Commerce Commission under paragraph 6 of Section 5 of the Transportation Act of 1920, plaintiff claiming no such application of approval was necessary, and defendants claiming the contrary.

Plaintiff's application to the Interstate Commerce Commission was filed and approval had under paragraph 18 of Section 1 of the Transportation Act, said paragraph being as follows:

"After ninety days after this paragraph takes effect, no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

The order of the Interstate Commerce Commission certified that the present and future public convenience and necessity require and will require the acquisition and operation by the New York, Chicago and St. Louis Railroad Company, a consolidated corporation of the states of New York, Pennsylvania, Ohio, Indiana, and Illinois, of the lines of railroad described in said application and report (Plaintiff's Exhibit 2).

The defendants in the case at bar contend that the plaintiff company should have filed its application and secured its approval of the Interstate Commerce Commission under paragraph 6 of Section 5 of the Transportation Act, which paragraph is as follows:

"It shall be lawful for two or more carriers by railroad, subject to this Act, to consolidate their properties or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership, management and operation, under the following conditions:

"(a)  The proposed consolidation must be in harmony with and in furtherance of the complete plan of consolidation mentioned in paragraph (5) and must be approved by the Commission.

"(*b*)    The bonds at par of the corporation which is to become the owner of the consolidated properties, together with the outstanding capital stock at par of such corporation, shall not exceed the value of the consolidated properties as determined by the Commission.    The value of the properties sought to be consolidated shall be ascertained by the Commission under Section 19*a* of this Act, and it shall be the duty of the Commission to proceed immediately to the ascertainment of such value for the properties involved in a proposed consolidation upon the filing of the application for such consolidation.

"(*c*)    Whenever two or more carriers propose a consolidation under this section, they shall present their application therefore to the Commission, and thereupon the Commission shall notify the governor of each state in which any part of the properties sought to be consolidated is situated and the carriers involved in the proposed consolidation, of the time and place for a public hearing.    If after such hearing the Commission finds that the public interest will be promoted by the consolidation and that the conditions of this section have been or will be fulfilled, it may enter an order approving and authorizing such consolidation, with such modifications and upon such terms and conditions as it may prescribe, and thereupon such consolidation may be effected, in accordance with such order, if all the carriers involved assent thereto, the law of any state or the decision or order of any state authority to the contrary notwithstanding."

For the purposes of the motion, it is admitted that only a *de jure* corporation can exercise the right of eminent domain in Ohio; that the plaintiff corporation has complied with state law requirements governing the incorporation and consolidation of railroads.

It is apparent that the solution of this question depends upon the interpretation and scope of paragraph 6 of Section 5 of the Transportation Act.    Did Congress, by this paragraph, intend to occupy the field of incorporation and consolidation of railroad companies, or did it intend solely to occupy the field relating to the consolidation of railroad properties; and if it relates solely to the consolidation of

railroad properties, is the wording of the paragraph permissive and intended to facilitate the unification of railroad properties, or mandatory and prohibitive until a complete plan is adopted by the Interstate Commerce Commission?

Did Congress, when it enacted the Transportation Act, and particularly paragraph 6 of Section 5 of said Act, intend to occupy the entire field of railroad incorporation? This question is best answered by referring to the many proposals for federal incorporation of railroads, the report of the committee on Interstate and Foreign Commerce by Mr. Esch, the recommendations of the Interstate Commerce Commission, and the consideration given by Congress through its various committees to these proposals. It must be conceded that the right to grant corporate charters and the granting of the same is an exercise of sovereign power and that the power is inherent in sovereignty; that the various state governments are as much sovereign in this respect as the federal government and Congress's right to limit this right of the states must be conferred upon it by the Constitution of the United States. It also must be conceded that the Constitution of the United States does not deprive the states of the power to grant corporate franchises and charters.

The Supreme Court of the United States has expressed itself upon this question as follows:

"It has never been supposed that the dominant power of Congress over interstate commerce took from the states the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers * * *. In the division of authority with respect to interstate railways, Congress reserves to itself the superior right to control their commerce and forbid interference therewith; while to the states remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests." *Louisville & Nashville Railroad Co.* v. *Kentucky,* 161 U. S., 677.

"The power of corporations of other states to become corporations, or to constitute themselves a consolidated

corporation under the Ohio statutes, and thus avail of the rights given thereby, is as completely dependent on the will of that state as is the power of its individual citizens to become a corporate body, or the power of corporations of its own creation to consolidate under its laws." *Kansas City, etc., Railroad Co.* v. *Stiles,* 242 U. S., 111.

It seems clear from the legislative history of the Transportation Act that Congress did not intend to occupy the field of corporate consolidation. This history is found in H. R. 10453 and shows a distinct purpose and intent to avoid the field of federal incorporation. Under heading "2. Federal Incorporation" of said report, on pages 5 and 6, quoting from the remarks of Mr. Esch, Chairman of the Committee on Interstate and Foreign Commerce of the House:

"Federal incorporation was strongly urged before the Newlands Joint Commission in 1916, and the chief reason offered then and re-offered during the course of the hearings recently ended before your committee was to get rid of the so-called '48 masters' * * *. But a principal 'argument for federal incorporation lies in the fact that the carriers so incorporated would be relieved, in a large measure, of the regulation by the states * * *. The primary purpose behind federal incorporation is the elimination of state control. While ultimately this may come to pass, we are convinced that the country is not yet ready to endorse legislation which would bring about so radical a change * * *. For the above, among other reasons, your committee has not adopted federal incorporations and made it a part of the pending bill."

An appendix to the above report reveals that Congress at the time had under consideration a number of plans involving federal incorporation of railroads, such as Senate Committee Plan, Railway Executives' Plan, the Transportation Conference Plan, the Warfield Plan, Amster Plan, Plum Plan, and Commerce Commission Plan, and that all were rejected.

From the above, there can be no question but that Congress did not intend to include the subject of corporate organization and corporate franchise in the provisions of the Transportation Act; that these powers were left with the states and that paragraph 6 of Section 5 applies only to the subject of consolidation of railroad properties.

In the discussion of the interpretation and scope of paragraph 6 of Section 5 of the Transportation Act, in reference to the question of consolidation of railroad properties, and the date when the provisions of said Act shall take effect and be in force, it must be conceded that Congress, by said paragraph, does indicate its intention to occupy the field eventually to the exclusion of the states, but it seems clear that Congress intended this occupation only after a complete plan is adopted by the Commission. The Commission not having reached this stage, it does not seem reasonable to say that Congress intended that no consolidation should be effected in the interim.

The Supreme Court of the United States has said that questions of this nature must be answered by judgment upon the particular case, *Pennsylvania R. R. Co.* v. *Public Service Commission of Pennsylvania,* 250 U. S., 556; that the intent of Congress to supersede the exercise by the states of their police power will not be inferred unless the act of Congress fairly interpreted is in actual conflict with the state law; and that it should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifest. *Savage* v. *Jones, State Chemist of Indiana,* 225 U. S., 501; *Atlantic Coast Line R. R. Co.* v. *State of Georgia,* 234 U. S., 280; that Congress may so circumscribe its regulations in regard to a matter within its exclusive jurisdiction as to occupy only a limited field and leave a part of the subject open to incidental legislation by the states. *Southern Railway Co.* v. *Railroad Commission of Indiana,* 236 U. S., 439. See also *New York Central Railroad Co.* v. *Winfield,* 244 U. S., page 154, and *Sherlock* v. *Alling,* 93 U. S., 99.

Congress in enacting paragraph 4 of Section 5 of the Transportation Act instructed the Interstate Commerce

Commission as soon as possible to prepare and adopt a
plan for the consolidation of the railway properties of the
continental United States into a limited number of sys-
tems, and in paragraph 5 of said section, instructs the
Commission that when it has agreed upon a tentative plan,
it shall give the same due publicity and upon reasonable
notice, including notice to the governor of each state, shall
hear all persons who may file or present objections thereto
and that after all hearings are at an end, the Commission
shall adopt a plan for such consolidation and publish the
same; also that the consolidations therein provided for
shall be in harmony with such plan.   Paragraph 6 of said
section says that it shall be lawful for two or more car-
riers by railroad, subject to this Act, to consolidate their
properties or any part thereof, into one corporation for
the ownership, management, and operation of the prop-
erties theretofore under separate ownership, management,
and operation, and provides that the proposed consolida-
tion must be in harmony with and in furtherance of the
complete plan of consolidation mentioned in paragraph 5.
There is nothing in these sections to indicate that Con-
gress intended to exclude the states in the matter of con-
solidation of railroads prior to the adoption of a complete
plan by the Interstate Commerce Commission and as far
as can be ascertained from the text of the Act, its his-
tory and the decisions of the Interstate Commerce Com-
mission, it was not intended that the states should be so
excluded.   On the other hand, railroad operation and con-
solidation require that some method or machinery be avail-
able during this interim and Congress must have appre-
ciated this fact as did the majority members of the Inter-
state Commerce Commission, in the matter of the appli-
cation of the plaintiff company, Finance Docket No. 2919,
wherein they say:

"Applicable state laws afford means to effect the con-
solidation.   Such laws are in force.   They are, in fact,
the laws to which resort must be had to effectuate consoli-
dation which the Interstate Commerce Act is designed to
facilitate.   We cannot conclude that they have been nul-
lified or superseded.   As valid existing laws we have no
power to suspend them.   Authority in us to withhold ap-

proval in the public interest of security issues when state laws permit consolidation, does not mean that we may not grant approval when public interest requires that we do so. Furthermore, in the absence of mandatory provisions of a federal statute, we should give full faith and credit to the acts of sovereign states, especially when, as in this case, their action is unanimous. The provisions of the Interstate Commerce Act do not provide for compulsory consolidation. That idea was considered by the Congress and rejected. In view of that rejection, it does not seem we should conclude that the Congress intended to prevent voluntary consolidations under available state laws in order thereby to force consolidation under such general plan as we may ultimately adopt. The provisions of the Interstate Commerce Act regarding consolidations have ample purpose without construing them as denying the right of state corporations to consolidate where state laws permit. We must conclude that if the Congress had intended to suspend state laws until we should at some later time elect to permit their use, such intent would have been manifested in plain terms. Where intent is not clearly shown, we are not called upon by laborious construction to find federal intent to dissipate state power. In view of the obvious intent of the Congress to facilitate and encourage worthy consolidations and of the comprehensive power given to us, it would be unfortunate to construe the law as preventing a consolidation which serves the public interest in an exceptional degree as here."

In this connection it should be noted that the Interstate Commerce Commission, in the case of the merger of subsidiary companies with Boston and Maine Company, reported in 76 I. C. C. Reports on page 797, held that paragraph 6 of Section 5 of the Transportation Act did not become effective and will not become effective until the Interstate Commerce Commission adopts the completed plan provided for in paragraph 5 of said section and therefore the provisions for making application under said paragraph and obtaining the approval of the Commission were not available; also that since this decision, the Commission has not approved an application for consolidation un-

der said paragraph, but that it has approved numerous applications for the consolidation of railroad properties into one corporation for ownership and operation under paragraph 18 of Section 1.

For the above reasons the court is of the opinion that Congress did not intend the provisions of paragraph 6 of Section 5 of the Transportation Act to become effective or available until the adoption of the completed plan provided for in paragraph 5, and the court finds itself unable to agree with the argument that paragraphs 4, 5 and 6 of Section 5 of the Transportation Act are mandatory or prohibitive, but is of the opinion that they were intended to afford relief to railroad companies from the operation of restrictive and prohibitory federal anti-trust laws; that the words used are those of relief and permission. They do not say that it shall be unlawful to do certain things, but, on the contrary, say that they shall be lawful under certain conditions and upon approval by the Commission, meaning thereby that such applicants as shall receive approval shall be relieved from the prohibitions of federal anti-trust laws and not subject to prosecution thereunder. In other words, in complying with the conditions set out in paragraphs 1 to 7 of Section 5 of the Interstate Commerce Act, the carriers are afforded the relief prescribed in paragraph 8 of said Act, and are permitted to do what they might otherwise have been prohibited from doing under the federal anti-trust laws.

The plaintiff, as shown by its Exhibit 2, obtained from the Interstate Commerce Commission the necessary certificate of public convenience and necessity under paragraphs 18 to 21 of Section 1 of the Act and the necessary order of approval for the issue of securities under Section 20a of the Act, and it is provided by paragraph 20 of Section 1 of the Interstate Commerce Act that from and after the issuance of such certificate, the carrier may "without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation or abandonment covered thereby," and paragraph 7 of Section 20a of the Interstate Commerce Act as added by the Transportation Act of 1920,

provides that "The jurisdiction conferred upon the Commission by that section shall be exclusive and plenary and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein."

The Interstate Commerce Commission is an administrative body with quasi-judicial powers that are strictly limited and subject only to direct court review, its decisions are conclusive; provided always that it acts within its statutory jurisdiction. Whether or not the Commission has exceeded its authority depends, of course, upon the intent of Congress and the construction to be given to the various paragraphs of said Act. It seems to the court that the reasoning above and construction contained therein is the correct reasoning and construction and that the Interstate Commerce Commission in so holding was clearly within its authority.

Counsel have also advanced the argument that where the Commission has given a construction to a statute and has followed a uniform practice in its application, it is the settled doctrine of state courts to lean in favor of such construction and to follow and give effect to such decisions. The court agrees with this doctrine and believes that the law in this respect, as announced in the cases of *Anthony Carlin Co.* v. *Heinz, Director General of Railroads*, 107 O. S., 328, and followed by the Supreme Court of the United States in *United States* v. *Alabama Great Southern Railroad Co.*, 142 U. S., 615, and as announced in a recent Illinois case, decided by the Supreme Court of Illinois, Feb. 16, 1927, known as *People of Illinois* v. *Illinois Central Railroad Co. et al.*, is sound, and that when the executive department of the government, charged with the execution of a statute, gives a construction to it, and acts upon that construction for a series of years, a state court should follow that construction.

For the above reasons, the motion to dismiss is overruled.