## LEHIGH COAL & NAVIGATION COMPANY *v.* UNITED STATES.

### CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 38.    Argued October 14, 1919.—Decided November 10, 1919.

Under a covenant in a long lease of its railroad properties, made in 1871 by the Lehigh Coal & Navigation Company to the Central Railroad of New Jersey, a connecting carrier, the coal of the Lehigh Company was transported from its mines in Pennsylvania to New Jersey points at rates less than were charged by the Central on coal from other mines of the same region; the allowance was indicated in all tariffs (262 in number) filed by the Central in and after the year of the Hepburn Act (1906), by a note not specifying it in figures but referring to the lease and covenant; and for receiving such allowances in the years 1912–1915, the Lehigh Company was indicted for *knowingly* receiving rebates or concessions whereby the coal was transported at a less rate than that named in the tariffs, in violation of the Elkins Act as amended by the Hepburn Act (c. 3591, 34 Stat. 584). Discrimination was not charged. *Held,* that the defendant was entitled to prove that it received such allowances in the honest belief that they were sufficiently described in and justified under the tariffs, such belief having been based on advice given the defendant when the tariff description was first formulated, upon the acceptance without objection by the Interstate Commerce Commission of the numerous tariffs containing it, upon information from the carrier, in 1908, that the form was specifically approved by the Commission through its officer in charge of tariffs, and upon the fact that the Commission, in 1909, was informed through an examination of defendant's records and books of the receipt of such allowances and did not object. P. 562. *Armour Packing Co.* v. *United States,* 209 U. S. 56, distinguished.

THE case is stated in the opinion.

*Mr. Henry S. Drinker, Jr.,* with whom *Mr. Abraham M. Beitler* and *Mr. Wm. Jay Turner* were on the briefs, for Lehigh Coal & Navigation Co.

*Mr. Henry S. Mitchell,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States:

The alleged mistake of law was irrelevant to the question whether the statute was violated by the shipper. The same alleged mistake was held irrelevant to the question whether the statute was violated by the carrier. *Central Railroad Co.* v. *United States,* 229 Fed. Rep. 501.

The rejection of the claim of good faith concerning the footnote in the tariff, as a defense in the carrier's case, is authority for following the same course on the same facts in the case of the shipper, because the principle thus enforced against the carrier was one previously established by this court as against shippers. *Armour Packing Co.* v. *United States,* 209 U. S. 56. The *Armour Case* was followed in *Chicago, St. P., M. & O. Ry. Co.* v. *United States,* 162 Fed. Rep. 835.

The *Armour Case* and the *Chicago, St. P., M. & O. Ry. Case* arose under the Elkins Act prior to the insertion therein of the word "knowingly" by the Hepburn Act of 1906, and defendant emphasizes that, as if it had an important bearing in this case. But the prosecution in *Central Railroad Co.* v. *United States,* was based on the statute with the word "knowingly" inserted, and the Court of Appeals there held that the asserted belief that the law was complied with, by means of the footnote in the tariff, was irrelevant to the question whether the statute was violated.

The word "knowingly" in the act is evidently to be taken as consistent with established conceptions of the law. Thus it may exclude responsibility in cases of mistake of fact; for instance, a miscalculation of the freight payable, or an error as to the contents or weight of packages shipped. Or it may exclude individual liability in the case of an officer having only partial knowledge of essential facts. So too, conceivably, liability may be

excluded in the case of a shipper who made a mistake as to a tariff and erroneously thought the rate he paid was published in the tariff.

We see no reason to take the word "knowingly " in the act as referring to a knowledge of law, thus excluding responsibility where there was a mistake of law with full knowledge of the facts and of the act done, and thus overriding the established principle that knowledge of the law is presumed.

Counsel for defendant rest the argument in their brief upon the assumption that defendant misunderstood the meaning of the tariff. The sole misunderstanding which the excluded testimony tended to show would consist in supposing that the "allowances " could be justified by the footnote in the tariff and that would be a misunderstanding of the Elkins Act, not of the tariff.

The prohibition in the Elkins Act of rebates which reduce the published rate is in terms absolute. There is in the Act to Regulate Commerce as amended by the Hepburn Act of 1906 provision for allowances for transportation services rendered by a shipper. But another provision of the Act to Regulate Commerce requires that all allowances shall be specified in the tariffs, whilst the footnote in the tariff did not specify the amount of the "allowances " to the defendant. But, wholly apart from the lack of specification, these "allowances " could not be justified upon the theory that they were for transportation services, because they were in fact not for such services. In the anthracite regions the term "lateral allowance " means an allowance for transportation services rendered by a shipper. *Mitchell Coal Co.* v. *Pennsylvania R. R. Co.*, 230 U. S. 247, 252. As the Court of Appeals held in *Central Railroad Co.* v. *United States, supra,* "nothing appears to support " the representation that these "allowances" were for transportation services. 229 Fed. Rep. 509.

MR. JUSTICE McKENNA delivered the opinion of the court.

The case is here on certificate, an outline of which it is necessary to give.

The Lehigh Coal & Navigation Company, herein called the Company, is a miner and shipper of anthracite coal and was indicted, convicted and fined in the District Court of New Jersey for accepting rebates and concessions from the Central Railroad of New Jersey in violation of the Elkins Act, as amended in 1906, 34 Stat. 584.

It was charged in each count of the indictment that the Central Railroad Company was an interstate carrier of coal and as such filed tariffs and schedules with the Interstate Commerce Commission showing its rates and charges from the coal fields in Pennsylvania to points in New Jersey.

During 1912, 1913, 1914 and a part of 1915, the tariffs were in force and under them the Company shipped a carload (described in the indictment) from its colliery in Pennsylvania to a specified point in New Jersey and accepted from the railroad a portion of the rate due and payable so that the coal was carried at less than the rate and the Company thus received the advantage of an illegal rebate. Discrimination was not charged.

In accordance with circumstances which are detailed at length in the certificate, among which was the fact that the Company at one time operated a railroad of its own (the Lehigh & Susquehanna), the Company decided to lease its railroad properties to the Central Railroad, a connecting carrier. Accordingly, March 31, 1871, the Company made a lease to the Railroad, the 10th covenant of which provided as follows:

". . . on coal delivered for transportation by the Company on sidings at the northern end of the Nesquehoning tunnel, the rates of transportation shall not exceed

the rates charged at the same time from Penn Haven to the same points on coal from the Lehigh region, either by the Central Railroad or by the Lehigh Valley Railroad Company."

In making the lease naturally the Company took into account the advantageous nearness of its mines to tide and sought to insure favorable rates for the coal from its collieries.

About 1878 the method of fixing rates was changed but the rate to be charged the Company was fixed at 86% of the rate charged to other mines in the Lehigh region, the reason being that there was that difference in distance. While this arrangement was in force the Company paid a net rate calculated on the basis of 86%. After 1887, the date of the first act to regulate commerce, this method of settlement was changed and the Company was charged the full tariff rate, but was rebated or credited with 14% thereof, this being done under the obligation or supposed obligation of the 10th covenant. And between 1887 and August, 1906, when the Hepburn Act went into effect, this arrangement for repayment did not appear in the tariffs filed by the Railroad with the Commission. But in August, 1906, and thereafter, the tariffs contained a foot- note in the following form:

"(4) In compliance with the Tenth Covenant of the lease from the Lehigh Coal & Navigation Company under which the Central Railroad Company of New Jersey operates the Lehigh and Susquehanna Railroad, a lateral allowance is made out of herein-named rates to the Lehigh Coal and Navigation Company on all Anthracite coal originating on the latter's tracks in the Panther Creek, Nesquehoning, and Hacklebarnie, Districts mined and shipped by it, when coming via the Hauto, Nesquehoning, and Mauch Chunk gateways."

All of the tariffs of the Railroad filed with the Commission after 1906 (262 in number) contained the footnote.

The allowance was 19.18 cents per ton and this was credited in the monthly settlement of the Company's account with the Railroad, the credit being the point of the Government's attack.

"The verdict covers 27 shipments of coal in prepared sizes from Nesquehoning colliery for reshipment at Elizabethport. The foregoing facts were either proved or stipulated, and it appeared also without dispute that during the years in question the Company's officers were familiar with the contents of the Central Railroad's tariffs, and knew that the allowance was being made and accepted. One of the Company's defenses was that it had not 'knowingly' accepted a rebate within the meaning of the Act— its contention being, that the allowance had been accepted in good faith, in the honest belief that the payment was justified by the 10th covenant, and also in the honest belief that the allowance was properly and legally noted and provided for in the filed and published tariffs."

The Company offered evidence that would support the following findings:

(1) At the time the note was made, the Company was informed of it, but was advised that the note had been made part of the tariff in full compliance with the Act of 1906, and that being so the payment and receipt of the allowance would comply with the tariff and the law and the officers of the Company relied on this judgment.

(2) Between 1906 and the date of the indictment 262 tariffs, all containing the note, had been filed and accepted by the Commission.

(3) In 1908 the Company had been informed by the Railroad that the Commission (acting through one of the Commission's important officers who was in charge of the tariffs) had specifically approved the form of the tariff containing the note, in spite of the fact that the amount of the allowance had not been specified therein, the Commission at the time having the question under consideration,

By reason of such information the Company honestly believed that the receipt of the allowance was not in violation of the tariff or the act, but was in compliance therewith.

(4) The Company's books, records and accounts were examined by the Commission's investigators in 1909, and the Commission was thereby informed that the Company had received and was receiving the allowance, but the Commission did not object either to the form or the substance of the practice.

"The Company's evidence concerning good faith was received under the Government's objection, and the Goverment offered evidence in contradiction thereof. At the close of the trial the court struck out all the evidence on this subject from the record, and refused to submit the question of good faith to the jury, holding that the Company's honest belief that the allowance was permitted by the tariffs and the footnote thereto could not affect the issue, for the reason that the Company knew the contents of the tariffs, and knew also that the allowance was actually made and received."

The certificate asks the following questions:

"1. In the criminal prosecution of a shipper for knowingly accepting transportation at less than the duly established rate by receiving an allowance that was referred to in the tariff but was not specified in figures therein, has the defendant a right to offer evidence that the allowance was received under the honest belief that it was lawfully established by the tariff, and under the honest belief that in receiving it he was not disregarding what he believed to be the provisions of the tariff but was complying therewith?

"2. Upon the foregoing facts, and in view of the kind and amount of evidence offered upon the subject of good faith, did the district court err in the present case by refusing to submit the question to the jury?"

The questions asked depend upon the construction of the Elkins Act, as enacted in 1903 (32 Stat. 847) the relevant

part of which is as follows: " . . . It shall be unlawful for any person, persons, or corporation to offer, grant, or give or to solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said Act to regulate commerce and the Acts amendatory thereto whereby any such property shall *by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier* [italics ours] . . ." And under an amendment in 1906 (34 Stat. 584) an offender, "whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebate, concession, or discrimination shall be deemed guilty of a misdemeanor."

The way to a correct construction of the act was to an extent cleared by the case of *Armour Packing Co.* v. *United States*, 209 U. S. 56. Its evolution was there detailed. It was said that carrier and shipper are charged with an equal responsibility and liability and that the act "proceeded upon broad lines" to accomplish this equality, and "that the only rate charged to any shipper for the same service under the same conditions should be the one established, published and posted as required by law." And this was declared in various ways to be the test of obligation and liability and the "form by which or the motive for which" its evasion or disregard is accomplished is not of modifying or determining consideration. It was in effect decided that the purpose of the statute took emphasis and meaning from the use of the word "device," and "device" was defined to be "anything which is a plan or contrivance" and is "disassociated" from qualification and "need not be necessarily fraudulent," and by it the act sought "to reach all means and methods by which the unlawful preference of rebate, concession or discrimination is offered, granted, given or received."

It is in effect the contention of the Government that the

language of the case exhausts definition and excludes the supposition of the questions of the Circuit Court of Appeals. We are unable to concur. The language of the case is easily explained by the question that was presented for decision. The Armour Packing Company contended that the act was directed only at fraudulent conduct, the obtaining of a rebate by some dishonest or underhand method, concession or discrimination. The language of the court was addressed to this contention and its selection and adequacy are manifest.

No such contention is made in the case at bar and there are other distinguishing elements. It will be observed that by the statute and the decision the test of equality is the tariff rate. It was said in the opinion that it is "the purpose of the act to punish those who give or receive transportation, in the sense of actual carriage, at a concession from the published rates" (*New York Central R. R. Co. v. United States,* 212 U. S. 500, 505). And such was the offense of the Armour Packing Company. There was no evasion of the tariff rate in the case at bar. The filed tariff indicated the existence and obligation of the 10th covenant of the lease from the Company to the Railroad, that is, the fact of the allowance was declared, though it did not have specification in figures. The tariff, of course, would have been more definite and complete with such specification, but its sufficiency was certainly believed in, for between 1906 and the date of the indictment it had 262 repetitions. The Company was given besides the assurance that it had the sanction of the Interstate Commerce Commission.

There was no attempt at deception. The Commission knew by examination of the Company's books of the allowance and the amount of the allowance. Such, then, is the situation, and distinguishes the case from the *Armour Packing Company Case.* There there was an omission to comply with the statute and the omission was attempted to

be justified by honesty of motive and purpose; here there was compliance or attempted compliance with the statute—a tariff filed—and if a question could be raised upon its legal sufficiency the belief of the Company in its legality was supported by high authority and those circumstances can bring into action and exculpating effect the provision of the statute which requires the acceptance of a rebate to be "knowingly" done to incur the guilt of a misdemeanor. This conclusion gives no detrimental example against the efficacy of the law.

We think this comment and conclusion enough to dispose of the questions asked and that there is no necessity to review the cases cited by the Company or the Government.

Some of the contentions of the Government we may notice. It is contended that the "lateral allowance" provided for in the 10th covenant and footnote to the tariff was not for transportation services and besides that there was no testimony whatsoever that the meaning of any provision of the tariff was misunderstood. The mistake, if any, it is hence insisted, was a mistake of law, not of fact. Two deductions are hence made by the Government: (1) That the allowances were not made for transportation services; (2) mistake of law is irrelevant to the question of the guilt or innocence of the Company.

To the first we may reply it is not involved as an element in the question asked of this court and if it have any justification, as to which we express no opinion, it no doubt will be considered by the Circuit Court of Appeals upon the return of the case. The other expresses a refinement. Indeed, the contention of the Government is somewhat elusive and we are not sure that we exactly estimate it. It is said "The sole misunderstanding which the excluded testimony tended to show would consist in supposing that the 'allowances' could be justified by the footnote in the tariff and that, as we have seen, would be a

misunderstanding of the Elkins Act, not of the tariff."
We are unable to concur. There was no misunderstand-
ing of the Elkins Act or what it required. The misunder-
standing was induced by practice and the opinion of those
in authority that the act was complied with and the word
"knowingly" therefore, as we have already indicated,
must be considered and given exculpating effect if error
there was.

We therefore answer the first question in the affirma-
tive, but as explained by reference to the certificate of
facts above. We do not think it is necessary to answer the
second question.

MR. JUSTICE McREYNOLDS took no part in the decision.