**UNITED STATES of America, Appellee,**

v.

**UNITED STATES STEEL CORPORATION, Appellant.**

**No. 80–1206.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1980.

Decided April 1, 1981.

Wayne L. Emery (argued), Richard J. Munsch, J. F. Wilson, Pittsburgh, Pa., for appellant United States Steel Corporation.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., Thomas K. Berg, U. S. Atty., Minneapolis, Minn., Michael Kimmel, Bruce G. Forrest, Richmond I. McKay (argued), Attys., Civ. Div., Dept. of Justice, Washington, D. C., for appellee.

Before LAY, Chief Judge, HENLEY, Circuit Judge, and HANSON,* Senior District Judge.

LAY, Chief Judge.

United States Steel appeals from a grant of summary judgment assessing damages against it in a civil forfeiture proceeding brought by the United States under the Hepburn Act, § 2, 49 U.S.C. § 41(3).[1] The

---

* William C. Hanson, Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. Citations to the Interstate Commerce Act are, for convenience, to the code prior to recodification. The Hepburn Act, ch. 3591, § 2, 34 Stat. 588 (1906), 49 U.S.C. § 41(3) provided in pertinent part:

> Any person, corporation, or company who shall deliver property for interstate transportation to any common carrier, subject to the provisions of sections 41, 42, or 43 of this title, or for whom as consignor or consignee,

any such carrier shall transport property from one State, Territory, or the District of Columbia to any other State, Territory, or the District of Columbia, or foreign country, who shall knowingly by employee, agent, officer, or otherwise, directly or indirectly, by or through any means or device whatsoever, receive or accept from such common carrier any sum of money or any other valuable consideration as a rebate or offset against the

Hepburn Act makes it illegal for a shipper knowingly to obtain the transportation of property at less than the published and filed tariff rates. This action was brought by the United States seeking forfeiture in the sum of three times the value of the rebates received by U.S. Steel between August 1969 and March 1974. Both the Government and U.S. Steel filed motions for summary judgment. On October 6, 1978, the United States Magistrate issued a report and recommended that the Government's motion be granted. By order filed January 14, 1980, the United States District Court for the District of Minnesota denied U.S. Steel's motion for summary judgment and granted the Government's. Judgment was entered in the total amount of $3,557,276.73, representing treble the value of rebates received by U.S. Steel, from which this appeal is taken. We vacate the judgment of the district court and remand for further proceedings in accord with this opinion.

## I. *Background.*

U.S. Steel purchased coal from mines in the eastern United States for the production of steel at its Duluth Works in Duluth, Minnesota. The coal was initially shipped from the mines by the Chesapeake & Ohio Railway to Toledo, Ohio, (first leg of a lake cargo route), then by lake steamer to the port of Duluth (second leg), and finally by rail to U.S. Steel's Duluth Works (third leg). A separate tariff was filed by the carriers for each leg. The tariffs published by the Chesapeake & Ohio for the first leg of the route included provisions for payment of refunds to qualifying shippers upon certification that the third leg movement was to "an interior destination" as defined in the tariff.[2] Between August 1969 and March 1974 the Chesapeake & Ohio refunded U.S. Steel $1,185,758.91 of the amount initially charged for the shipment of coal to Toledo. These refunds are the subject of this appeal.

The tariff applicable in this case, first published in its present form in February 1953, authorized eastern railways to refund a portion of their transportation charges:

Upon evidence in form of certificate shown in Item 155 that cargo coal shipped hereunder has been placed in vessels consigned to docks—

1. In the United States on Lake Superior, including Sault Ste. Marie, MI., and the West Bank of Lake Michigan north of the Illinois-Wisconsin State Line, and *thence transported from such docks* (either as coal or as coal briquettes produced from such coal at the docks) to *interior destinations* in the United States not more than two (2) years after the date

regular charges for transportation of such property, as fixed by the schedules of rates provided for in said sections, shall in addition to any penalty provided by said sections forfeit to the United States a sum of money three times the amount of money so received or accepted and three times the value of any other consideration so received or accepted, to be ascertained by the trial court; and the Attorney General of the United States is authorized and directed, whenever he has reasonable grounds to believe that any such person, corporation, or company has knowingly received or accepted from any such common carrier any sum of money or other valuable consideration as a rebate or offset as aforesaid, to institute in any court of the United States of competent jurisdiction, a civil action to collect the said sum or sums so forfeited as aforesaid; and in the trial of said action all such rebates or other considerations so received or accepted for a period of six years prior to the commencement of the action, may be included therein, and the

amount recovered shall be three times the total amount of money, or three times the total value of such consideration, so received or accepted, or both, as the case may be. This section was originally enacted by Act of June 29, 1906, ch. 3591, § 2, 34 Stat. 588, which amended the Elkins Act, ch. 708, § 1, 32 Stat. 847 (1903), and is now codified at 49 U.S.C. § 11902.

2. In 1951 in *James McWilliams Blue Line, Inc. v. United States*, 100 F.Supp. 66 (S.D.N.Y. 1951), aff'd per curiam, 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707 (1952), the court held that, in a proportional rate structure similar to lake cargo coal rates, the availability of a rebate on the first leg of the route could not be based solely upon the mode of transportation used in the third leg. After this decision, the eastern railways amended their lake cargo tariffs to allow shippers using modes of transportation other than rail for third leg movements to qualify for rebates on the first leg.

coal was loaded into vessels at Lake Erie Ports. (Emphasis Supplied)

The tariff also defined the term "interior destination" with respect to third leg movements by rail or other modes of transportation:

> *For purposes of tariff application, transportation from docks* in the United States on Lake Superior, including Sault Ste. Marie, MI., or on the West Bank of Lake Michigan north of the Illinois-Wisconsin State Line, to *interior destinations* in the United States, or from docks on Lake Superior including Sault Ste. Marie, MI. and Sault Ste. Marie, On. in the United States or Canada to interior destinations in Canada *referred to above means*:
>
> (1) *If transported from said docks by rail, the transportation must be by rail as road-haul freight*;
>
> (2) If transported from said docks by any other means, the transportation must be to interior destinations in the United States or to interior destinations in Canada located outside both the railroad switching limits and the corporate limits of the origin port city. (Emphasis Supplied)

U.S. Steel's Duluth Works is within the corporate limits of the City of Duluth. This fact raises the issue of whether intracity movements of coal from the Duluth docks to Duluth Works was transportation to an "interior destination" within the meaning of the tariff so as to qualify U.S. Steel for rebates under the lake cargo coal tariff.[3] U.S. Steel argued before the magistrate that the tariff defines interior destination alternatively as (1) any destination in or outside Duluth reached by rail as road-haul freight, or (2) any destination outside the railroad switching limits and corporate limits of Duluth if transported from such docks by any means other than road-haul freight. The magistrate rejected this interpretation, and recommended judgment for the Government.

U.S. Steel alleges the district court erred in granting the Government's motion for summary judgment on various grounds: (1) the tariff is not ambiguous and requires no interpretation; (2) alternatively, the court erred in its construction and failed to consider evidence bearing on the appropriate construction of the tariff; (3) if the tariff is ambiguous, the Interstate Commerce Commission had primary jurisdiction to interpret the tariff; (4) the court erred in concluding, as a matter of law, that the defendant knowingly violated the tariff and, thus, deprived U.S. Steel of its right to trial by jury; and (5) the court erred in refusing to dismiss the complaint because of unreasonable delays in bringing the suit.

## II. Whether the Tariff is Ambiguous.

U.S. Steel argues that it was entitled to summary judgment because the tariff unambiguously authorizes refunds to a shipper located within the upper lakes port city which has the coal moved from the docks by rail as road-haul freight. U.S. Steel's position is that the term "interior destination" has no geographic prerequisite where the ex-dock transportation is by rail as road-haul freight. The Government contends that the Commission has already defined "interior destination" as a matter of law to include a geographic requirement that the third leg movement be transportation to a location outside the corporate limits of the port city. The Government further urges that a contrary interpretation cannot be given because the tariff would then be discriminatory in violation of section 2 of the Interstate Commerce Act, 49 U.S.C. § 2.

The district court noted the differing interpretations of the term "interior destination" and determined that the tariff was ambiguous. Arguably, the modifier "interior" would ordinarily suggest a destination other than one within the port city. Alternatively, subparagraph (1) of the defining clause seems to define "interior destination" as a mode of transportation without regard to a geographic destination. The finding of ambiguity seems correct, particularly in

---

**3.** This intracity movement of coal is performed by the Duluth, Missabe and Iron Range Railway (DM&IR), a wholly owned subsidiary of U.S. Steel.

light of the existence of issues of fact concerning the drafting of the tariff and disputes over the relevance and meaning of various court and Commission decisions. Thus, the district court correctly denied U.S. Steel's motion for summary judgment.

### III. *The Construction of the Tariff.*

In recommending judgment in favor of the Government, the magistrate found that U.S. Steel violated the Hepburn Act by receiving rebates not authorized by the tariff because shipments to destinations within the corporate limits of the City of Duluth are not shipments to "interior destinations." The magistrate reasoned that U.S. Steel's interpretation of the tariff was unacceptable, as a matter of law, because that interpretation would cause the eastern railways to discriminate against shippers by allowing rebates for wholly intracity third leg movements by rail but disallowing rebates for wholly intracity third leg movements of coal by truck or other means. The court believed that such intermodal discrimination would violate 49 U.S.C. § 2 [4] and, therefore, was not an interpretation that could be adopted by the court, regardless of the resolution of disputed facts. We have difficulty with this analysis.[5]

In *United States v. Wabash Railroad,* 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827 (1944), the Supreme Court held that the determination of total charges due under a filed tariff for a combination of carrier services was to be accomplished by an investigation of the facts of the carrier's service to the particular shipper to be charged, irrespective of whether charging for a spotting service as part of the total charge would discriminate against the shipper in violation of section 2. *Id.* at 413, 64 S.Ct. at 756.[6] The lesson of *Wabash* is that to determine if a person has violated a tariff the primary inquiry is whether the particular carrier's and shipper's situation comes within the terms of the tariff, as defined according to their ordinary and intended meaning, practical application, and commercial context. *Accord Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338, 1340–41 (8th Cir. 1971).

---

4. Title 49 U.S.C. § 2 provides in pertinent part:

   If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.

   *See, I. C. C. v. Mechling,* 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); *Atchison, Topeka & Santa Fe Ry. v. United States,* 549 F.2d 1186 (8th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 223, 54 L.Ed.2d 154 (1977); *James McWilliams Blue Line, Inc. v. United States,* 100 F.Supp. 66 (S.D.N.Y.1951), *aff'd per curiam,* 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707 (1952).

5. It is not clear that the carrier would have violated § 2 if it had allowed U.S. Steel rebates for ex-dock intracity road haul movements but not for ex-dock intracity truck movements because the carrier would not have charged one shipper less than another for substantially the same service. The identification of a single shipper in this case may distinguish it from the § 2 cases relied upon in the district court. *See Blue Line,* 100 F.Supp. 66 (S.D.N.Y.1951), *aff'd per curiam,* 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707 (1952). Section 2 only prohibits "charging ... any person ... greater or less compensation ... than ... any other person for ... a like ... service ... under substantially similar circumstances." 49 U.S.C. § 2.

6. The Wabash Railroad performed a spotting service for the Staley Manufacturing Co. at its plant in Decatur, Illinois. After its investigation, the Commission refused the carrier permission to eliminate charges for the spotting service because performance of the service without charge, or considering the cost of service as included within the tariff rate, would depart from filed tariffs in violation of § 6(7) of the Interstate Commerce Act, 49 U.S.C. § 6(7). The district court subsequently set aside the Commission's order because the carrier's charging for the service would result in discrimination prohibited by §§ 2 and 3(1) of the Act, since similarly situated shippers were not charged for the service. 321 U.S. at 406, 64 S.Ct. at 753. The Supreme Court reversed. *Id.* at 413, 64 S.Ct. at 756.

The Hepburn Act prohibits only a shipper's departure from the terms of a tariff; that the tariff might be subsequently determined to be unlawful under section 2 in proper proceedings is not controlling for Hepburn Act purposes.[7] The district court apparently overlooked the possibility that the Chesapeake & Ohio may have published a discriminatory tariff, the compliance with which by U.S. Steel would incur it no liability under the Hepburn Act.

The magistrate relied on *Great Northern Railway v. Delmar Co.*, 283 U.S. 686, 51 S.Ct. 579, 75 L.Ed. 1349 (1931), for a rule of construction which requires district courts to interpret tariffs so as to avoid possible violations of law. *See also Penn Central Co. v. General Mills, Inc.*, 439 F.2d 1338, 1341 (8th Cir. 1971); *National Van Lines, Inc. v. United States*, 355 F.2d 326, 332–33 (7th Cir. 1966). Although we acknowledge the desirability of interpreting tariffs so as to obviate illegal results, we do not believe *Delmar* established an inviolable rule. We cannot accept such a myopic approach to tariff interpretation where it will result in substantial liability for a shipper without affording it a chance to prove it complied with the original and intended interpretation of the tariff.[8] We conclude the district court erred in construing the tariff solely upon the rule of construction which would attempt to avoid a violation of section 2. This rule as set out in *Penn Central* may be used to obviate a strict construction against a carrier. A corresponding rule of construction is that ambiguity or doubt should always be decided in favor of the shipper. However, more importantly, we think it fundamental before applying the limited rule of construction used by the magistrate, a court should first determine a permissible construction which conforms with the intentions of the framers of tariff. *See Penn*

**7.** U.S. Steel's distinction between legally published rates, the departure from which bears certain sanctions, and unlawful or discriminatory tariffs, which invoke different penalties, is well established. *See generally Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 238–40 (8th Cir. 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971). A tariff which is filed, approved and published in accordance with the Interstate Commerce Act has the force and effect of a statute. *Armour Packing Co. v. United States*, 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908); *Illinois Cent. G. R. R. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir. 1978). The carrier is bound to collect, and the shipper to pay, the legally established rate. *Baldwin v. Scott County Milling Co.*, 307 U.S. 478, 485, 59 S.Ct. 943, 948, 83 L.Ed. 1409 (1939); *Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553 (1907); *Chicago, B. & Q. R. R. v. Ready Mix Concrete Co.*, 487 F.2d 1263, 1267 (8th Cir. 1973). Such legally established tariffs may be unlawful if they violate other sections of the Interstate Commerce Act. *See United States v. Michigan Cement Co.*, 270 U.S. 521, 524, 46 S.Ct. 395, 396, 70 L.Ed. 713 (1926); *James McWilliams Blue Line, Inc. v. United States*, 100 F.Supp. 66 (S.D.N.Y.1951), *aff'd per curiam*, 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707 (1952) (tariffs which provided rebates for ex-dock rail shipment but not for ex-dock barge shipments violated § 2); *Atchinson, T. & S. F. Ry. v. United States*, 549 F.2d 1186 (8th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 223, 54 L.Ed.2d 154 (1977). Nevertheless, carriers must collect their published rates, even though they are violative of other sections of the Interstate Commerce Act. *Davis v. Portland Seed Co.*, 264 U.S. 403, 425, 44 S.Ct. 380, 384, 68 L.Ed. 762 (1924) ("The statute requires rigid observance of the tariff, without regard to the inherent lawfulness of the rates specified.") *See also Oregon Short Line R. R. v. American Smelting & Refining Co.*, 269 F. 898 (8th Cir. 1920).

**8.** The application of the principle of tariff construction in *Delmar* produced a quite different result from the one obtained in this case. In *Delmar*, the result was the denial of reparations to a shipper upon finding that the customary charges were not in excess of those prescribed by the tariff which was interpreted so as to avoid problems under the long and short haul clause, 49 U.S.C. § 4. In this case, the result was treble liability for the refunded portion of customary charges upon a ruling that the shipper paid less than prescribed by the tariff which was interpreted to avoid possible § 2 problems. The necessary corollary of ruling that U.S. Steel paid less than the tariff prescribed is that the Chesapeake & Ohio Ry. collected less than the tariff prescribed in violation of § 6(7). Thus, the district court's interpretation, designed to avoid hypothetical § 2 problems, means that, for 20 years, U.S. Steel and its carrier violated the prohibitions against departing from the terms of the tariff. The district court finds two actual violations of law in order to avoid one hypothetical violation.

*Central,* 439 F.2d 1340–41. Here the magistrate did not undertake this investigation.

IV. *Primary Jurisdiction.*

■ Where an issue of tariff construction raises questions of transportation policy presenting a need for uniform and expert administration of the regulatory scheme laid down by the Interstate Commerce Act, the Commission has primary jurisdiction.[9] *United States v. Western Pacific Railroad,* 352 U.S. 59, 65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Justice White summarized:

> No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. See *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. *See Far East Conference v. United*

*States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576.

*Id.* at 64, 77 S.Ct. at 165.

■ In the present case, we have concluded that preliminary interpretation by the Commission is necessary because there is a dispute as to whether the words "interior destination" are used in an ordinary or special sense. *Texas & Pacific Railway v. American Tie & Timber Co.,* 234 U.S. 138, 146, 34 S.Ct. 885, 888, 58 L.Ed. 1255 (1914). Since such a dispute could only be resolved within the court system by fact finders which might reach different results in similar cases, the interest of uniform regulatory policy favors an initial determination by the Commission. *See Thompson v. Texas Mexican Railway,* 328 U.S. 134, 147–48, 66 S.Ct. 937, 945–946 (1946); *see also* Jaffe, Primary Jurisdiction, 77 Harv.L.Rev. 1037, 1043 (1964). Resort to the Commission in this case would also promote uniform transportation policies because the Commission could consider the tariff in light of transportation policies under the Interstate Commerce Act, including section 2.

■ Since the Commission has had similar lake cargo tariffs before it on several previous occasions, its expertise and familiarity with these tariffs could prove valuable for resolving this dispute. An investi-

9. In suits between a shipper and carrier where construction of a tariff requires evidence of the peculiar meaning of certain words attached by usage to the tariff, the preliminary interpretation should be made by the Commission. In *Great N. Ry. v. Merchants Elevator Co.,* 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922), Justice Brandeis stated:

> [W]here the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the Commission; and not until this determination has been made, can a court take jurisdiction of the controversy. If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not be attained. For the effect to be given the tariff might depend, not upon construction of the language—a question of law—but upon whether or not a particular judge or jury had

found, as a fact, that the words of the document were used in the peculiar sense attributed to them or that a particular usage existed.

*Id.* at 292, 42 S.Ct. at 479.

Illustrative of cases which have required a factual determination by the Commission to precede the court's interpretation are: *Texas & Pac. Ry. v. American Tie & Timber Co.,* 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255 (1914) (the question of whether the word "lumber" as used in a carrier's tariff included oak railroad crossties required preliminary referral to the Commission); *McLean Trucking Co. v. United States,* 387 F.2d 657, 660–61 (Ct.Cl.1967) (the question whether the word "destination" was used in its ordinary sense in the pertinent tariff was to be determined preliminarily by the Commission); *Louisville & N. R. R. v. Knox Homes Corp.,* 343 F.2d 887 (5th Cir. 1965) (transit privileges); *United States v. Great N. Ry.,* 337 F.2d 243, 246–47 (8th Cir. 1964) (transit privileges).

gation of the facts surrounding the issuance of the tariff and the history, practical application, and commercial context of the terms "interior destination" and "road-haul freight" would be relevant. Additionally, the question whether U.S. Steel's road-haul movement qualifies it for rebates may depend on an analysis of the cost considerations that underlie the rebate policies governing other Great Lakes shippers who are similarly situated to U.S. Steel. The Commission has primary jurisdiction over considerations of cost factors, *United States v. Western Pacific Railroad*, 352 U.S. 59, 69, 77 S.Ct. 161, 167, 1 L.Ed.2d 126 (1956), and treatment of similarly situated shippers, *United States v. Wabash Railroad*, 321 U.S. 403, 411, 64 S.Ct. 752, 755, 88 L.Ed. 827 (1944).

■■■ That the Hepburn Act directs the Attorney General to proceed in federal court should not obviate the primary jurisdiction of the Commission over disputed issues of a technical nature.[10] The doctrine of primary jurisdiction applies even when the courts have exclusive jurisdiction over the initiation of the action.[11]

The Government further contends that sending the issue of tariff interpretation to the Commission is not warranted because the Commission has already made its position clear by referral of this case to the

Attorney General for prosecution. We cannot assume that referral to the Attorney General constitutes a clear interpretation by the Commission. We are cited no formal Commission interpretation, and the Government does not demonstrate that the Commission analyzed the historical or commercial evidence on this technical question of tariff construction. Furthermore, referral for prosecution by an employee of the Commission cannot bind the Commission, *Thompson v. Texas Mexican Railway*, 328 U.S. 134, 146, 66 S.Ct. 937, 944, 90 L.Ed. 1132 (1946).[12]

The Government argues that it is not necessary to refer the matter to the Commission since the Commission has already made clear its interpretation of this tariff in *Refund on Lake Cargo Coal*, 278 I.C.C. 117 (1950); *Refunds on Lake Cargo Coal to Canadian Ports*, 293 I.C.C. 27 (1954); and *Refund Provisions, Lake Cargo Coal*, 299 I.C.C. 659 (1957).[13] None of the cases holds that the tariff disallows rebates when coal is moved within the upper lake port as road-haul freight. In direct contradiction to the Government's interpretation of the lake cargo tariff is the Commission decision in *Chicago & North Western Railway v. Louisville & Nashville Railroad (Sheboygan)*, 318 I.C.C. 286 (1962). The Commission decision recognized that a shipper re-

---

10. The mere fact that the United States is a party does not obviate the primary jurisdiction of the Commission, as evidenced by cases involving the United States as a shipper where the Commission has primary jurisdiction over issues of fact. *See, e. g., McLean Trucking Co. v. United States*, 387 F.2d 657, 661 (Ct.Cl.1967); *United States v. Great N. Ry.*, 337 F.2d 243, 246–47 (8th Cir. 1964).

11. *See Hewitt-Robins, Inc. v. Eastern Freight Ways, Inc.*, 371 U.S. 84, 89, 83 S.Ct. 157, 160, 9 L.Ed.2d 142 (1962) (it is not a premise of the doctrine of primary jurisdiction that the agency have the power to grant the relief sought in the judicial action). In § 9 proceedings which may be initiated in the courts or Commission, when issues within the primary jurisdiction of the Commission arise, the court will refer such issues to the Commission and retain exclusive jurisdiction of any civil action to enforce, enjoin, set aside, or annul a Commission order arising out of the referral. 28 U.S.C. § 1336(b); *I. C. C. v. Atlantic Coast Line R. R.*, 383 U.S.

576, 580, 86 S.Ct. 1000, 1004, 16 L.Ed.2d 109 (1966).

12. The Government also suggests that the reasons for not referring an issue to the Commission when the Commission brings the action apply with equal force when the Justice Department does so. When the Commission is a party the principal function of the doctrine of primary jurisdiction, i. e., to learn the agency's position, has already been fulfilled. K. Davis, 3 Administrative Law Treatise § 19.02, at 14 & n.41 (1958). In this case, however, the Commission's position has not been clearly defined.

13. Although the magistrate concluded that these opinions would not be sufficient to resolve the factual issue concerning the meaning of "interior destination" the magistrate notes that the Commission's decisions relied upon by the government supports the Government's interpretation.

ceived rebates for third leg intracity road-haul movements of coal under the lake cargo tariff. That such a practice occurred at Sheboygan under a tariff similar to the one covering shipments to Duluth during some of the same years raises a genuine issue of fact regarding the tariff's interpretation.[14]

The Government urges that the district court construction of the tariff was made necessary in order to obviate the question of unlawful discrimination under section 2; it urges that the discrimination which would result from U.S. Steel's interpretation is so obvious that no special Commission expertise is needed. We disagree on both grounds.

As we have earlier discussed, we do not find U.S. Steel's construction of the tariff necessarily results in discrimination.[15] Further, in *Indiana Harbor Belt Railroad v. United States*, 510 F.2d 644 (7th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), the Seventh Circuit held that a district court, in reviewing the determination of the Commission about the application of a tariff, should not consider ab initio the question whether the Commission's interpretation of the tariff would result in discrimination unlawful under section 2. In *Harbor Belt*, the Seventh Circuit stated:

> We think, however, that the district court in reaching its decision took into consideration matters not properly before it and that on the issue which was properly before it, the validity of the interpretation by the Commission of the tariffs involved, the court erred. We are satisfied, in particular, that it was not within the province of the district court, in re-

viewing the determination of the Commission on this issue, to consider *ab initio* the question whether the application of the tariffs as interpreted by the Commission, would result in unlawful discrimination in violation of section 2 of the Interstate Commerce Act. 49 U.S.C.A. § 2. For it is settled that primary jurisdiction for determining whether rate charges are discriminatory lies with the Interstate Commerce Commission and not with the courts. *United States v. Wabash R. R.*, 1944, 321 U.S. 403, 410–411, 64 S.Ct. 752, 755–756, 88 L.Ed. 827. The inquiry involves the exercise of discretion in a technical field requiring the expertise of the Commission, whether it is conducted to determine if a party in the past has been wronged, a judicial function, or to determine what rate or practice shall be deemed·reasonable in the future, a legislative function. *Great Northern Ry. v. Merchants Elevator Co.*, 1922, 259 U.S. 285, 291, 42 S.Ct.. 477, 479, 66 L.Ed. 943. That a body should exist fitted to make a primary determination from the facts as to whether a preference or discrimination obtains was one of the reasons for the creation of the Commission. *United States v. Chicago Heights Trucking Co.*, 1940, 310 U.S. 344, 352, 60 S.Ct. 931, 935, 84 L.Ed. 1243. Thus the courts must enforce a rate, even though alleged to be discriminatory, until the matter of discrimination has first been decided by the Commission. *Texas & Pacific Ry. v. Abilene Cotton Oil Co.*, 1907, 204 U.S. 426, 439, 27 S.Ct. 350, 354, 51 L.Ed. 553. Indeed one of the purposes of the Interstate Commerce Act is to provide an effective

14. The *Sheboygan* decision involved transportation of coal to a utility company which had a plant within the corporate and switching limits of Sheboygan, Wisconsin. From March 1953 to October 31, 1960, the utility received rebates under the lake cargo coal tariff for third leg intracity road-haul movements. *See* 318 I.C.C. at 287–88 nn. 3 & 5 and accompanying text. As the magistrate noted, after October 31, 1960, the tariff was amended and other modes of third leg transportation qualified for rebates. Nevertheless, the magistrate overlooked the fact that for eight years before 1960 an intraci-

ty shipper, like U.S. Steel in Duluth, received rebates under a lake cargo coal tariff for third leg road haul movements.

15. *See* note 5 supra. Moreover, § 2 prohibits only that discrimination which is unjust. *Nashville, C. & St. L. Ry. v. Tennessee*, 262 U.S. 318, 322, 43 S.Ct. 583, 584, 67 L.Ed. 999 (1923). Whether some historical, commercial or economic circumstances might justify the discrimination perceived by the magistrate is an issue delegated initially to the Commission by the statute and interpretations under it.

**1294**

means to redress unjust discrimination through the publication of rates and their undeviating application subject to review and approval by the Commission.

*Id.* at 649 (footnote omitted).

Courts have long recognized that Congress intended to commit to the Commission the determination, by application of an informed judgment to existing facts, of the existence of forbidden discrimination. *United States v. Chicago Heights Trucking Co.*, 310 U.S. 344, 352–53, 60 S.Ct. 931, 935–936, 84 L.Ed. 1243 (1940); *United States v. Louisville & Nashville Railroad*, 235 U.S. 314, 320, 35 S.Ct. 113, 114, 59 L.Ed. 245 (1914). A judgment that tariff rates "are unreasonably high or discriminatory . . . lies solely within the province of the Interstate Commerce Commission." *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 222 (8th Cir. 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971). *See also Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951); *Thompson v. Texas Mexican Railway*, 328 U.S. 134, 137, 66 S.Ct. 937, 941, 90 L.Ed. 1132 (1946); *Robinson v. Baltimore & Ohio Railroad*, 222 U.S. 506, 511, 32 S.Ct. 114, 116, 56 L.Ed. 288 (1912); *Coca-Cola Co. v. Atchinson, Topeka & Santa Fe Railway*, 608 F.2d 213, 220 (5th Cir. 1979); *Union Pacific Railroad v. Bay Area Shippers Consolidating Association*, 594 F.2d 1291 (9th Cir. 1979); *Danna v. Air France*, 463 F.2d 407, 410 (2d Cir. 1972); *Taylor County Sand Co. v. Seaboard Coast Line Railroad*, 446 F.2d 853, 854–55 (5th Cir. 1971); *Chicago, Rock Island & Pacific Railroad v. Furniture Forwarders of St. Louis, Inc.*, 420 F.2d 385, 388–89 (8th Cir. 1970).[16]

We conclude that the district court erred in failing to refer the issue of tariff construction to the Commission under the doctrine of primary jurisdiction.

## V. *Scienter Under the Hepburn Act.*

Since the referral to the Commission necessitates a remand to the district court we find it unnecessary to deal with most of the remaining issues, which may be mooted and will certainly be illuminated by the construction imposed on the tariff by the Commission. We think it well, however, to address here an issue of law decided by the district court, relating to U.S. Steel's defense of lack of scienter against liability under the Hepburn Act in the circumstances of this case.

The Hepburn Act makes it an offense for a shipper to "knowingly . . . receive or accept . . . a rebate or offset against the regular charges . . . as fixed by the [tariffs]." *See* n.1, *supra*. The district court, relying on *Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908) and *Union Petroleum Corp. v. United States*, 376 F.2d 569 (10th Cir. 1967), held that it is no defense even if the shipper establishes that it received the rebate in the good faith and reasonable belief that it was authorized to do so under the applicable tariff—in the belief, in effect, that it was paying no more and no less to the carrier than the regular charge fixed by the tariff, and did not believe, much less know, that it was receiving a rebate or offset against the subsequently determined "regular charge." According to the district court, "[i]t is simply not a defense to [a Hepburn Act] forfeiture suit that the defendant gave a mistaken legal interpretation to the tariff. . . . [T]he requirement that the shipper must 'knowingly' receive a concession . . . requires only that the shipper must have intentionally done something the effect of which was to violate the statutory prohibitions." The district court would thus in effect read the scienter requirement out of

---

16. The Government argues that the Commission's primary jurisdiction over § 2 issues does not prohibit the district court from rejecting, as a matter of law, an interpretation of the tariff which would violate § 2. The Government's distinction between setting aside a tariff under § 2 and construing one in light of § 2 is not an inherently obvious distinction. The district court's ruling means that U.S. Steel could prove no set of facts which would allow its liability under the Hepburn Act to be determined under an interpretation which authorized rebates for third leg intracity road-haul movements. This is very much akin to setting aside a tariff as discriminatory.

the Hepburn Act, and impose strict liability on shippers who receive rebates or offsets against the "regular charges" fixed by tariff, even where the shipper may honestly and reasonably believe that it is receiving no unauthorized rebate or offset.

We do not think that Congress intended to go so far. As its legislative history reveals, the Hepburn Bill [17] was sent from the House of Representatives to the Senate in early 1906.[18] When Senator McCumber originally introduced the treble forfeiture amendment, it contained no scienter requirement.[19] The Senate adopted the treble forfeiture provision but proscribed only "knowingly and willfully" receiving rebates or offsets against normal charges.[20] The Conference Committee struck "knowingly and willfully" from the amendment, making the provision one essentially of strict liability, like Senator McCumber's original proposal.[21] This deletion sparked considerable debate in the Senate, and these debates indicate that the Senate was unwilling to punish with criminal or treble forfeiture sanctions honestly mistaken departures from published rates or honest mistakes as to the appropriate rate.[22] The Conference Committee reinstated the requirement that departures from published rates be "knowing" to warrant the Hepburn Bill sanctions.[23] The bill passed both houses with this language. There is little doubt that the Hepburn Act was not intended to impose sanctions on shippers who receive rebates or offsets in the honest and reasonable belief that they are entitled to them under the terms of the applicable tariffs.

This conclusion is confirmed by *Lehigh Coal & Navigation Co. v. United States*, 250 U.S. 556, 40 S.Ct. 24, 63 L.Ed. 1138 (1919), a case similar to this one in many respects. In *Lehigh Coal* the shipper had for some years prior to the enactment of the Hepburn Act been receiving a rebate of 14% of the applicable tariff rate from the carrier under the terms of the contract between them. After the Hepburn Act went into effect, a footnote was added to the tariff which apparently provided for the rebate in the tariff itself. All of the tariffs filed by the carrier after 1906 contained the footnote, and the shipper continued to receive the rebate, apparently with the knowledge of the I.C.C. itself. In the subsequent criminal prosecution under the Elkins Act as amended by the Hepburn Act, one of the shipper's defenses was

> [T]hat it had not "knowingly" accepted a rebate within the meaning of the Act— its contention being, that the allowance had been accepted in good faith, in the honest belief that . . . the allowance was properly and legally noted and provided for in the filed and published tariffs.

250 U.S. at 561, 40 S.Ct. at 25.

At the close of the trial the district court struck from the record all of the evidence on the subject of the shipper's good faith,

> [A]nd refused to submit the question of good faith to the jury, holding that the [shipper's] honest belief that the allowance was permitted by the tariffs and the footnote thereto could not affect the issue, for the reason that the [shipper] knew the contents of the tariffs, and

---

**17.** H.R. 12987, 59th Cong., 1st Sess. (1906).

**18.** H.R.Rep.No. 591, 59th Cong., 1st Sess. 1 (January 27, 1906).

**19.** Senator McCumber's original proposal provided:

> That if it be established that any railroad company has granted or paid, directly or indirectly, by or through any means or device whatever, any rebate or preference to any shipper, that both such railroad and said shipper shall be adjudged to pay a fine of three times the amount of such rebate. . . .

40 Cong.Rec. 2973 (1906).

**20.** 40 Cong.Rec. 6628 (1906).

**21.** Conf.R., Railway Rate Bill, S.Doc.No. 476, 59th Cong., 1st Sess. 3 (1906) (amendment number 29 . . . strike out "knowingly and willfully". . . .); 40 Cong.Rec. 7932 (1906).

**22.** 40 Cong.Rec. 7932–36, 7985, 7987, 7990–92, 7995 (1906).

**23.** Conf.R., Rate Bill, H.R.Doc.No. 5003, 59th Cong., 1st Sess. 3 (June 23, 1906); Conf.R., Rate Bill, H.R.Doc.No. 5076, 59th Cong., 1st Sess. 3 (June 28, 1906).

knew also that the allowance was actually made and received.

*Id.* at 562, 40 S.Ct. at 25.

The Supreme Court held that this was error. Noting that the shipper's misunderstanding of the tariff (if any) "was induced by practice and the opinion of those in authority that the act was complied with," the Court found that "the word 'knowingly' ... must be considered and given exculpating effect if error there was," *id.* at 566, 40 S.Ct. at 26, specifically holding that the shipper had

> [A] right to offer evidence that the allowance was received under the honest belief that it was lawfully established by the tariff, and under the honest belief that in receiving it he was not disregarding what he believed to be the provisions of the tariff but was complying therewith[.]

*Id.* at 562, 566, 40 S.Ct. at 25–26.

The clear implication is that a shipper has a defense against a prosecution under the Hepburn Act if it establishes its honest and reasonable belief that it was entitled under the terms of the applicable tariff to any rebate or offset it may have received.

*Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908), and *Union Petroleum Corp. v. United States*, 376 F.2d 569 (10th Cir. 1967), are not to the contrary. *Armour Packing* was decided before *Lehigh Coal* and under the version of the Elkins Act in effect before the insertion of the word "knowingly" by the 1906 amendments. In any case, in *Armour Packing* the shipper clearly knew what tariff applied and what rates that tariff fixed; its defense to the Elkins Act prosecution was that it believed in good faith that its contract with the carrier, rather than the published tariff, controlled the rates it must pay. The Supreme Court simply held that the shipper would be held to know that as a matter of law the tariff rates prevailed over the contract rates; the Court specifically reserved the question later addressed in *Lehigh Coal* and raised here, "Whether shippers who pay a rate under the honest belief that it is the lawfully established rate, when in fact it is not,

are liable under the statute...." 209 U.S. at 85–86, 28 S.Ct. at 437. *Union Petroleum* too is distinguishable from this case. There the shipper paid the carrier a transit or through rate lower than the local rates even though it was substituting one product for another at an intermediate point of the journey. Its defense to the Elkins Act prosecution was that it "acted in the honest and reasonable belief that it was entitled to avail itself of the transit tariff privilege." 376 F.2d at 573. The Tenth Circuit rejected this defense, finding that the shipper "had full knowledge of the tariffs as well as all facts which would render the transit privilege inapplicable and discriminatory herein ...." *Id.* We think that this finding was probably sufficient to negate the shipper's good faith defense *on the merits*, on the ground that the shipper could not have believed "honestly and reasonably" that it was entitled to the transit rate in view of its full knowledge of the relevant tariffs and the facts rendering the transit rate inapplicable. We recognize that there is language in *Union Petroleum* that suggests that the court rejected the shipper's good faith defense *in principle*. To the extent that that language is inconsistent with the legislative history of the Hepburn Act and the holding of the Supreme Court in *Lehigh Coal*, we simply disagree with it.

We conclude that a shipper has a defense to a treble forfeiture proceeding under the Hepburn Act if it can establish that any rebates or offsets it may have received (even though these are later determined to be unauthorized by the applicable tariff) were received in the honest and reasonable belief that they were in fact authorized by the tariff, and that in receiving them the shipper was not disregarding what it believed to be the provisions of the tariff but was complying therewith. *Lehigh Coal & Navigation Co.*, 250 U.S. at 562, 566, 40 S.Ct. at 25–26. No other question concerning the scope of the scienter requirement of the Hepburn Act is raised by the record in this case, and we neither express nor imply any further opinion on that matter. As to the defense here recognized, we believe that

where a shipper can establish its honest and reasonable (though mistaken) belief by reference to ambiguities in the tariff itself, the history of its adoption and of practice under it or the opinions of those in authority about the rates fixed thereby, the shipper has a good defense. We leave the application of these principles to the facts of this case to the district court on remand.

In conclusion, we vacate the judgment of the district court adopting the magistrate's finding and remand for further proceedings in accord with this opinion. The Government, if it wishes to proceed with this action, shall file a petition for a declaratory order with the Commission for a determination of whether U.S. Steel's receipt of rebates was against regular charges established by the tariff. *Southern Pacific Transportation Co. v. United States*, 505 F.2d 1252, 1254 (Ct.Cl.1974). Upon referral to the Commission, the Commission should allow both parties to present evidence on the proper construction of the tariff. Once the Commission has interpreted the tariff, both U.S. Steel and the Government shall have the opportunity to challenge the Commission's interpretation in the district court, 28 U.S.C. § 1336(b).

The constitutional issues concerning vagueness and the denial of due process need not be passed upon until a more authoritative interpretation of the tariff is made. A different interpretation of the tariff may obviate these issues. The district court's judgment on these issues is vacated and these issues should be reviewed, if necessary, by the court following referral to the Commission in light of the evidence produced before the Commission and the court.

The judgment of the district court is ordered vacated and the cause is remanded for further proceedings consistent with this opinion.