**UNITED STATES of America,**
**Appellant,**

v.

**GREAT NORTHERN RAILWAY CO.,**
**Appellee.**

No. 17527.

United States Court of Appeals
Eighth Circuit.

Oct. 19, 1964.

Frederick B. Abramson, Attorney, Dept. of Justice, Washington, D. C., and John W. Douglas, Asst. Atty. Gen., Washington, D. C., Alan S. Rosenthal, Attorney, Civil Division, Washington, D. C., and Miles W. Lord, U. S. Atty., Minneapolis, Minn., for appellant.

Curtis H. Berg, St. Paul, Minn., for appellee.

Before VOGEL, MATTHES, and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

The primary question for determination in this appeal is whether "transit privileges" appearing in Western Trunk Lines Freight Tariff (WTLFT) No. 417–D, encompass the terms "inspection" and "reconsignment" and how the latter terms, referred to in such tariff, should be considered in computing transportation charges made in relation to specified shipments of grain by the Commodity Credit Corporation (CCC). From the opinion of the District Court appearing at 219 F.Supp. 415 (July 19, 1963) it is clear that the above issues were submitted on motions for summary judgment, filed by both parties, and that there is no disputed question of fact here involved. That being so, the matter for our determination is whether the question of law presented to the District Court was correctly applied to the undisputed facts hereinafter stated. Koepke v. Fontecchio, 177 F.2d 125 (9 Cir. 1949).

The instant action was brought to recover $5,088.82 for alleged freight overcharge. All the shipments but one were consigned by the CCC to itself at Minneapolis, at which point the grain was "inspected" and "reconsigned" to Duluth, Minnesota. One shipment consigned directly to Duluth from point of origin was incorrectly charged via Minneapolis; hence the judgment for $22.29 entered in favor of appellant for that amount. As to all the other shipments, appellee computed the rate from point of origin to Duluth via Minneapolis, and that amount was paid. Appellant's claim of overcharge as to the last-mentioned ship-

ments was disallowed by the District Court by its consideration of Items 95, 100 and 575 of this tariff. Item 95 is titled "Intrastate Traffic," wherein it is stated:

"In the application of the distance scales of rates * * * the distances shall be determined by use of the short intrastate distance using not more than three lines such distances to be figured via junction points where there are track connections for the transfer of carload freight without transfer of the lading * * *. On shipments accorded transit privileges as authorized in tariffs of the lines parties hereto, distances shall be computed via the transit station origin to destination."

There is no dispute that the above item is applicable to interstate shipments. Item 100 of the instant tariff provides that "Item 95 will also apply on interstate traffic having origin and destination in the State of Minnesota * * *." It is to be noted that the only exception in Item 95, supra, as to distance rates, is from the place of origin to destination, where "transit privileges" are allowed. Then the distance rate is computed via the transit point.

It is appellant's claim that "inspection" and "reconsignment" do not constitute "transit privileges"; and that the proper rate for the shipments of grain involved should have been computed on the short intrastate distance, origin to Duluth, which concededly amounts to a substantially less rate than the short intrastate distance via Minneapolis to Duluth as charged by appellee.

In ruling otherwise, the District Court based its decision on an interpretation of "Item 575" set forth below, by considering "reconsignment" to be a "transit privilege." It is appellant's contention that the District Court was in error in so ruling. Primarily, appellant bases its contention in the proposition that the interpretation of the term "transit privileges" as used in this tariff is within the primary jurisdiction of the I.C.C. and since the I.C.C. has determined prior to the time judgment was entered in this case that "inspection" and "reconsignment" are not "transit privileges," the District Court's ruling contra is clearly erroneous. (Citing Farmers Union Grain Terminal Association v. Canadian National Railways, et al., 313 I.C.C. 311 (1961) as modified, 315 I.C.C. 559 (1962), discussed below.) Appellee's response thereto is that construction of this tariff is a matter of law for the courts; that the prior determination by the I.C.C. is not binding on this Court; and that the applicable rates are a factual matter to be determined by the route selected by the appellant, in this instance via Minneapolis. Hence it is obvious that the only matter to be determined in this case is the correct construction of the above tariff.

The only explanation of "transit privileges" appearing in this tariff is Item 575, titled "Terminal or Transit Privileges or Services." In the course of that item it is stated:

" * * * Terminal or Transit Privileges or Services, including also

Car Rental,
Car Service,
Cartage,
Demurrage,
Diversion,
Elevation,
Heater Service,
Icing,
Lighterage,
Loading,
Private Car Mileage,
*Reconsignment,*
Refrigeration,
Stop-off,
Storage,
Switching,
Transfer,
*Transit Privileges,*
Unloading,
Weighing." (Emphasis added.)

The items above listed apparently constitute four classifications: *terminal privileges* and *terminal services, transit privileges* and *transit services,* with no evident division into those separate categories. In the light of the foregoing, it is readily apparent that the wording of Item 575, *ante,* is ambiguous and does not, on its face, support the statement of the District Court to the effect that that item specifically defines *reconsignment* as a transit privilege. The most that Item 575, *ante,* does is to state that "Terminal or Transit Privileges or Services" include, among twenty items, "Transit Privileges" and "Reconsignment," and this in a section of this tariff entirely unrelated to Item 95, in which "Transit Privileges" is used only in connection with rates.

At the outset it seems significant that the drafters of this tariff listed the two items *ante* separately under two general headings, leading to a conclusion that they did not assume one term used under one heading to encompass the other. More importantly, Item 95 *ante,* dealing with rates, does not specifically define what is there meant by the term "Transit Privileges." That it is capable of differing definitions, or that there is at least some confusion as to its meaning, is evident, for in Item 575 quoted above, by condensation in the heading and the list of included items, we find the statement, " \* \* \* Transit Privileges \* \* including also \* \* \* Transit Privileges \* \* \*." The above being so, it is necessary that the term "Transit Privileges" in Item 95 *ante,* be construed before any correct application of the rate structure in this tariff can be made.

 Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document. Great Northern Railway Company et al. v. Merchants' Elevator Company, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); A. E. West Petroleum Co. v. Atchison, T. & S. F. Ry. Co., 212 F.2d 812 (8 Cir., 1954). However, there are instances where preliminary resort to the I.C.C. for a construction is required, such as where the words requiring construction are of a technical nature, or where extrinsic evidence within the particular field of expertise of the agency is required to satisfactorily reach a conclusion. Great Northern Railway Company et al. v. Merchants' Elevator Company, supra; United States v. Western Pacific Railroad Co. et al., 352 U.S. 59, 77 S.Ct. 161, 1 L. Ed.2d 126 (1956); Northern Pac. Ry. Co. v. United States, 213 F.2d 366 (8 Cir. 1954); Western Oil & Fuel Co. v. Great Lakes Pipe Line Co., 210 F.2d 490 (8 Cir. 1954). This is generally referred to as the primary jurisdiction doctrine. That doctrine is applicable where a claim, though originally cognizable in the courts, is of such a nature that the question involved initially should be determined by an agency and is usually required as necessary before a court should proceed. McCleneghan v. Union Stock Yards Co. of Omaha, 298 F.2d 659 (8 Cir.1962); 3 Davis, Administrative Law, Sec. 19.01 (1958). That is so because " \* \* \* \* [T]he courts, while retaining the final authority \* \* \* should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern. \* \* \*" Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 498, 78 S.Ct. 851, 861, 2 L.Ed.2d 926 (1958). The above cases make clear that it is only when the words in the tariff are used in their common, ordinary sense, with no particular connotation in the expert field of the agency, that the doctrine of primary jurisdiction is not applicable and the construction becomes a matter of law for the courts without prior resort to the agency.

 In the instant case the words requiring definition are "Transit Privileges." On their face it is obvious that these words must have a particular connotation in the rail transportation field, being a generic term requiring specific definition. They certainly cannot refer to any privilege which might be insisted upon by a shipper while his commodity is in transit, but must in reason be lim-

-ited to certain previously understood conditions. Therefore, we think "Transit Privileges" as here considered is a matter for primary determination by the I.C.C. within its particular expertise and knowledge in the field of transportation; and that where it has previously made such a determination its decision should be given some consideration by the courts.

■ Here, appellant supported its motion for summary judgment by attaching copies of an opinion of "District Three of the I.C.C.," and one of the full Interstate Commerce Commission, in Farmers Union Grain Terminal Association v. Canadian National Railways, et al., supra. The District Court seemingly ignored such decisions of the I.C.C. and singularly relied on two of its own previous opinions in Great Northern Railway Company v. Commodity Credit Corporation, D.C., 164 F.Supp. 442, and same title, 175 F.Supp. 104, in rendering the judgment as it did. Although we do not premise error in the case at bar on failure of the District Court to refer the issue here considered to the expertise of the I.C.C., we think when an issue such as here is raised, requiring knowledge of a specialized field beyond the normal scope of experience of a court, it is necessary to review to establish that the expertise of an agency has at least been considered by the court, and that if it appears it has not done so, a judgment rendered by it is a priori suspect. Cf. Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

With the foregoing in mind, we first turn to a decision of the I.C.C. from which it is made clear what the term "transit privileges" means and which specifically defines it. In Northern Milling Co. v. Chicago & N. W. Ry. Co., 246 I.C.C. 499 (1941) at p. 502, it is stated:

"By transit (privileges) is meant the unloading and passing through elevators and mills of carload shipments of grain or grain products for storage and other purposes connected with marketing and manufac-turing and * * * forwarding * * * to destinations beyond the transit point."

From a survey of past I.C.C. decisions it is clear that "transit privilege" has always been considered by that agency to involve an actual unloading and treatment, or at least storage, of the commodity in transit, and that "transit privileges" and "reconsignment" are consistently treated differently, lending no support to the view that such terms might both be contained in "transit privileges." California Milling Corporation v. Atchison, T. & S. F. Ry. Co., 269 I.C.C. 725 (1948); The Transit Case, 24 I.C.C. 340 (1912); In Re Substitution of Tonnage at Transit Points, 18 I.C.C. 280 (1910); Reconsignment Case, 47 I.C.C. 590 (1917). That these views have been accepted by the courts is shown in Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 535, 62 S.Ct. 366, 367, 86 L.Ed. 432 (1942), wherein it is stated: "* * * the interruption of shipments of grain for the purpose of being stored, marketed, or processed— (is)—technically characterized as transit privileges * * *." (Par. added.)

■ The above authorities show that the traditional view of the I.C.C., and that of the courts, has been to consider "transit privileges" as involving unloading and treating a commodity, to be something quite different from "inspection" (which is accomplished without unloading), as is "reconsignment." However, it might be arguable that these general conclusions do not preclude the possibility of inspection and reconsignment being considered as transit privileges, but that it is not so here for that specific question has been ruled by the I.C.C. in relation to similar traffic as now before us. Its consideration of that point was made in a situation involving this same tariff, to which action appellee was a party and wherein the I.C.C. stated: "We find that the term 'transit privileges' as used in item 95 (of Western Trunk Lines Freight Tariff 417-D) does not include inspection or reconsignment." Farmers Union Grain

Terminal Association v. Canadian National Railways, et al., supra. That this view is in line with the historical interpretation of "transit privileges" as made by the I.C.C. is seen from the herein above-referenced authorities. In the light of the foregoing, it is clear that primary jurisdiction has been satisfied in the case at bar and there was no need to refer the instant matter again to the I.C.C. Cf. United States v. Western Pacific Railroad Co., supra.

Appellee argues that even though the I.C.C. has specifically considered the point here in question its decision and construction are not binding upon this Court, citing W. P. Brown & Sons Lumber Co. v. L. & N. R. Co., 299 U.S. 393, 57 S.Ct. 265, 267, 81 L.Ed. 301 (1937). The situation in that cited case is clearly distinguishable. There, a preliminary resort was had to the agency, but the Court specifically held that such was not necessary; and, further, that the item of tariff construction there considered was not of the type as to call into play the primary jurisdiction doctrine. Thus, the Court ruled that it was not bound to accord weight to the determination made by the I.C.C. An example of the view of the courts in connection with matters such as presently in question, where primary jurisdiction is applicable, is shown in United States v. I.C.C., 114 U.S.App.D.C. 298, 315 F.2d 44 (1963), a follow-up case to United States v. Western Pacific Railroad Co. et al., supra. The problem there in question having been considered by the I.C.C. after the finding of primary jurisdiction in the Western Pacific case, the Court in the I.C.C. case followed the findings of the agency, pointing out that this finding must be given great weight by the Court. It should be noted, however, that this was in a case where a direct attack on the holding of the I.C.C. was the issue; whereas in the present case the holding itself is not attacked, appellee merely arguing that a prior determination by the Commission should not be binding in this subsequent matter.

■■ It is clear, so far as the instant action is concerned, that the validity of the prior determination of the I.C.C. supra cannot be questioned here, for that issue is not before this Court. To rule otherwise would be to permit a collateral attack on that decision of the I.C.C. There remains, however, the question of its applicability to the present case. Certainly, it has no res adjudicata effect in this action. Cf. Seaboard Air Line Ry. Co. v. United States, 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129 (1920); Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999 (1931). However, while not binding on this Court per se, such decision is manifestly in a field as to entitle it to be given the greatest deference and weight. United States v. I.C.C., supra, at p. 46 of 315 F.2d. The rationale requiring such weight to be given to that decision is applicable where the same question comes up in a subsequent matter rather than on direct review. Cf. Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). As stated by the Court in Skidmore v. Swift & Co., 323 U.S. 134, at page 140, 65 S. Ct. 161, at page 164, 89 L.Ed. 124, 125 (1944): " * * * the rulings, interpretations and opinions of the (agency) while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."

As shown above, the determination here to be made is quite in line with a prior pronouncement of the I.C.C. distinguishing "transit privileges" and "reconsignment." This fact appearing, we think the District Court should have considered that decision in its construction of those terms as found in this tariff.

■ Appellee makes claim of unreasonable results possibly flowing from the I.C.C.'s construction of the terms of this tariff, as above considered, and points out some which it says are apparent in this case. A simple answer

to that contention is that appellee is in no position to argue for an interpretation different from the plain meaning of the words used by it in this tariff merely because it might lead to unreasonable results in some circumstances. As shown above, the construction here made to the instant tariff is consistent with the prior trend of I.C.C. decisions in regard to other tariffs. The possibility of unreasonable results flowing therefrom might well have provided a basis to attack the construction of this tariff initially, but such attack cannot now be made in a collateral action. Callanan Road Imp. Co. v. United States, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206 (1953). The most that can here be said is, if the construction made by the I.C.C. was not in accord with the carrier's understanding and intent of this tariff, the obvious remedies available to it were either a direct attack on the findings of the Commission in the case in which it was a party, or an amendment of the tariff to correspond with its intent. Even though unreasonable results may flow from this tariff, the meaning of the words used therein and as understood in the transportation field may not be disregarded. It must be remembered that tariffs are written by the carrier, and accordingly are construed in favor of the shipper in case of ambiguity. Armstrong Manufacturing Company v. Aberdeen & Rockfish Railroad Company, et al., 96 I.C.C. 595 (1925).

■ There is no merit to appellee's argument, that the construction of the term "transit privileges" in this tariff is not necessary to a decision in its favor, because appellant chose the route of shipment and thus the short intrastate distance rate should be applied via the route so chosen, regardless of the presence or absence of transit privileges. Such argument ignores the plain meaning of the words of the tariff as formed by appellee. The tariff unquestionably applies the rate to the distance origin to destination regardless of the actual physical movement of the cars containing the commodity with the one exception where "transit privileges" are granted. Appellee must have been aware of this fact as it authored the tariff, so it cannot now attempt to change the rate by judicial construction not in harmony with the plain meaning of the words in the tariff.

■ From the above it is apparent that the District Court was in error in its interpretation of the term "transit privileges" and the consequential granting of summary judgment to appellee. The matter should be reversed with direction to enter judgment in favor of appellant.