# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2406

_____

Qwest Communications Corporation, a Delaware corporation

*Third Party Plaintiff - Appellant*

v.

Free Conferencing Corporation, a Nevada corporation

*Third Party Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: June 16, 2016
Filed: September 15, 2016

_____

Before MURPHY, BRIGHT, and SHEPHERD, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Following a bench trial, the district court found third-party plaintiff-appellant Qwest Communications Corporation (Qwest) failed to prove its claims for intentional interference with a business relationship, unfair competition, and unjust enrichment

against third-party defendant-appellee Free Conferencing Corporation (FC).[1] Qwest appeals. We affirm the district court on the claims for intentional interference with a business relationship and unfair competition. We reverse and remand on the claim for unjust enrichment.

## I. BACKGROUND

Qwest is a long-distance telephone service provider, referred to as an interexchange carrier (IXC). Sancom, Inc. (Sancom), the original named plaintiff, is a local telephone service provider, referred to as a local exchange carrier (LEC), for the Mitchell, South Dakota, area.

When IXCs like Qwest transmit calls from one local area to a different local area, they pay fees to the LEC in each local area in order to compensate the LEC for delivering, or "terminating," the call locally on the LEC's infrastructure. These fees are typically paid on a per-minute basis, so the longer the call the more the IXC must pay the LEC.

Federal laws and regulations govern the contractual relationship between the IXC and the LEC. The Communications Act of 1934 requires the LEC to file with the Federal Communications Commission (FCC) its proposed charges for the IXC, and the FCC must approve this fee, called a tariff. 47 U.S.C. § 203(a). Unless specified in this tariff, the LEC may not otherwise charge the IXC a fee for terminating calls to local customers under its tariff rate. Id. at § 203(c). LECs may, however, receive some compensation from IXCs for calls they deliver to non-customers. Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Telephone Co., 24 F.C.C. Rcd. 14801, 14812 n.96 (2009) (hereinafter Farmers II).

---

[1]The district court also entered judgment in favor of FC on Qwest's claim for civil conspiracy, which Qwest does not appeal.

The terms of Sancom's tariff authorized it to charge IXCs, including Qwest, more than three cents per minute for calls it delivered to an "end user," which the tariff defined as an individual or other entity "which subscribe[d] to the services" Sancom offered. (Appellant's Appendix pp. 532, 535, Sancom Tariff § 2.6 (defining an "end user" as "any customer of an interstate or foreign telecommunications service that is not a carrier" and a "customer" as an individual, company, or other entity "which subscribes to the services offered under this tariff")). Therefore, if Sancom did not deliver a call to an individual or entity which subscribed to its services, it could not charge IXCs under the terms of the tariff for terminating the call.

In 2004, FC, a company that provides conference calling services to its customers free of charge, hired Darin Rohead, operating as PowerHouse Communications, to find LECs that would be interested in contracting with FC to host its conference call bridges. Rohead identified Sancom and drafted a contract that the parties later signed.

Under the terms of the contract, Sancom agreed to host FC's conference call bridges on its premises in Mitchell, South Dakota. FC guaranteed its conference call bridges would increase call traffic to Sancom's service area by a minimum number of minutes per month. In return, Sancom agreed to pay FC a "marketing fee" of 2.5 cents for each minute of call traffic that terminated at FC's conference call bridges.

Although unwritten in the contract, FC knew Sancom would charge the IXCs under its tariff for each minute of call traffic it terminated at FC's conference call bridges. The contract was therefore designed to take advantage of the tariff system: FC would increase the volume of call traffic IXCs delivered to Sancom's service area; Sancom would bill IXCs under its tariff for the increased traffic; and Sancom would pay FC a per-minute "marketing fee," effectively splitting the revenues from the increased traffic. While FC knew this contract would take advantage of the tariff system, the district court found FC President David Erickson credible when he

testified that he did not know the arrangement was unlawful, he did not intend to premise his business model on an unlawful source of revenue, and he would have taken any steps necessary to comply with the law.

FC's call bridges heavily increased call traffic to Sancom's service area. From March to April 2005, Sancom terminated roughly 3.7 million minutes of FC traffic. By the end of 2007, that number jumped to roughly 50 million minutes of FC traffic per month. In 2007 and the first half of 2008, FC traffic accounted for 98% of Sancom's overall traffic. During this time period, Sancom terminated roughly 686 million minutes of FC traffic and only 14 million minutes of traffic for all other customers. The FC traffic never interfered with Sancom's service to the other customers.

Today, it is well-settled that an LEC cannot bill an IXC under its tariff for calls "terminated" at a conference call bridge when the conference calling company does not pay a fee for the LEC's services. But when FC and Sancom first entered into their contract, this issue had not been litigated. The FCC first considered this issue in 2007. Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Telephone Co., 22 F.C.C. Rcd. 17973 (2007) (hereinafter Farmers I).[2] In Farmers I, the FCC held that a conference call company could qualify as an "end user" under the terms of an LEC's tariff as long as it paid the LEC a subscription fee for its services, even if the LEC, in turn, paid the conference call company a marketing fee that exceeded the subscription fee. Id. at 17987-88. Therefore, even if the conference call company received a net payment from the LEC, it could still qualify as an "end user," and the LEC could charge the IXC under its tariff for traffic that terminated at the conference call bridge. Id. at 17988.

---

[2]While Qwest was a party to Farmers I and Farmers II, these cases are unrelated to the current case.

Following <u>Farmers I</u>, Qwest filed a motion to reconsider with the FCC, asking it to revisit its holding in light of newly discovered evidence that the conference call companies were not actually paying a subscription fee to the LECs. See <u>Farmers II</u>, 24 F.C.C. Rcd. at 14801. The FCC granted Qwest's motion, and in November 2009 it held that an LEC could not charge an IXC under its tariff for calls delivered to a conference call bridge when the conference call company did not pay a fee to subscribe to the LEC's services. <u>Id.</u> at 14812-13. The FCC, however, indicated in a footnote that the LEC was not "precluded from receiving any compensation at all for the services" it provided to the IXC. <u>Id.</u> at 14812 n.96.

## II. PROCEDURAL BACKGROUND

Prior to <u>Farmers I</u>, Qwest stopped paying Sancom access charges, and on October 9, 2007, Sancom sued Qwest to recover the charges, advancing a handful of different legal theories. Qwest filed counterclaims against Sancom and also claims as a third-party plaintiff against FC for unfair competition, tortious interference with contract, civil conspiracy, and unjust enrichment.

After the FCC decided <u>Farmers II</u>, the district court referred three issues to the FCC: (1) whether Sancom violated its tariff by charging Qwest for calls that terminated at FC's call bridges; (2) whether Sancom was entitled to some compensation from Qwest for these calls even if it could not bill Qwest under its tariff; and (3) if so, what rate Sancom could charge Qwest for those calls. The FCC found FC was not an "end user" because it did not subscribe to Sancom's services, and therefore Sancom could not bill Qwest under its tariff for calls that terminated at FC's bridge. The FCC reserved ruling on the remaining two issues. Qwest subsequently settled with Sancom on all claims for an undisclosed amount.

In May 2014, Qwest and FC proceeded to trial before the district court. Following the bench trial, the district court issued an order and entered judgment in

favor of FC on all claims.  Qwest filed a motion to vacate judgment, which the district court denied on June 5, 2015.  Qwest timely appealed.

## III.  DISCUSSION

Qwest appeals the district court's judgment on its claims of intentional interference with a business relationship, unfair competition (via FC's inducement of regulatory violations), and unjust enrichment. "In reviewing a judgment after a bench trial, we review the district court's factual findings and credibility determinations for clear error, and its legal conclusions de novo." Affordable Cmtys. of Mo. v. Fed. Nat'l Mortgage Ass'n, 815 F.3d 1130, 1133 (8th Cir. 2016) (citing Fed. R. Civ. P. 52(a)(6)). "We will overturn a finding of fact only if it is not supported by substantial evidence, it is based on an erroneous view of the law, or we are left with a definite and firm conviction that an error has been made." Id.

### A.  Intentional Interference with a Business Relationship

Qwest argues the district court erred when it entered judgment in favor of FC on its claim for intentional interference with a business relationship.  Under South Dakota law,[3] the plaintiff must prove five elements for a claim of intentional interference with a business relationship: "(1) [T]he existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and, (5) damages to the party whose relationship or expectancy was disrupted." Selle v. Tozser, 786

---

[3]We apply South Dakota law to Qwest's claims in tort and in equity, as both parties agree.  See Platte Valley Bank v. Tetra Fin. Grp., LLC, 682 F.3d 1078, 1082 (8th Cir. 2012).

N.W.2d 748, 753 (S.D. 2010) (alteration in original). The parties dispute only the third element: whether FC committed an intentional and improper act of interference.

To determine when interference is improper, South Dakota courts weigh a handful of non-exhaustive factors, referred to as the Gruhlke factors: "(a) [T]he nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." Gruhlke v. Sioux Empire Fed. Credit Union, 756 N.W.2d 399, 408 (S.D. 2008). Motivation of personal gain generally is not enough to satisfy the improper interference requirement. Id. at 408 n.13.

The district court considered the Gruhlke factors and found Qwest did not meet its burden to prove FC's interference was improper. It highlighted that FC President David Erickson credibly testified that he did not intend to cause Sancom to breach its tariff; FC's motivation to maximize its own profits was not improper; and FC's interests were not inconsistent with the societal interests in the tariff regulatory system. Qwest Commc'ns Corp. v. Free Conferencing Corp., No. Civ. 07-4147, 2014 WL 5782543, at *10 (D.S.D. Nov. 6, 2014).

Qwest argues the district court erred when it found FC's interference was not improper, because the FCC's finding, on referral from the district court, that FC's business model was "intentionally designed to take advantage" of Sancom's tariff mandates a finding of impropriety. While this FCC finding relates to only some of the Gruhlke factors, Qwest argues that under South Dakota law and the Restatement (Second) of Torts, which South Dakota follows, it is unnecessary to weigh any other factors where case law has developed a "more or less crystalized rule." (App. Br. p. 44 ("The court erred because no further analysis was necessary once the district court

-7-

found FC's business was premised on interjecting itself into Sancom's tariff billing of Qwest, and thereby inducing a contract breach.") (citing Restatement (Second) of Torts § 767 cmt. j (1979))).  The "more or less crystalized rule" that FC violated, Qwest argues, is that a business model premised on inducing a party to breach its contract is tortious interference per se.

We have found no such per se rule under South Dakota law, let alone a rule so ingrained in South Dakota case law that it can be characterized as "more or less crystalized."  Rather, the South Dakota Supreme Court is clear:  even when the defendant induces the third party to breach its contract, the court must examine whether the inducement is wrongful.  See Lien v. Nw. Eng'g Co., 39 N.W.2d 483, 486 (S.D. 1949) ("When one has knowledge of the contract rights of another, his *wrongful* inducement of a breach thereof is a willful destruction of the property of another and cannot be justified on the theory that it enhances and advances the business interests of the wrongdoer.") (emphasis added).  This inquiry turns on the particular facts of each case.  Gruhlke, 756 N.W.2d at 408.

Under these circumstances, we agree with the district court that FC did not act with an improper purpose when it contracted with Sancom, because FC was simply attempting to take advantage of the uncertain regulatory scheme at the time.  When FC entered into its contract with Sancom in 2005, it was unsettled whether its business model complied with the tariff system.  FC had a legitimate argument that it could be considered an "end user," and thus Sancom could bill Qwest under its tariff for calls delivered to FC's call bridges, because FC "paid" for Sancom's services through a netting agreement: Sancom charged FC for subscribing to its services; FC charged Sancom for technical support and marketing; and the net result was that Sancom owed FC money.  It was not until the FCC's Farmers II decision in 2009 – after this lawsuit began – that it appeared that FC's business model violated Sancom's tariff.  Significantly, the district court found credible Erickson's testimony

that he did not know FC's business model violated the tariff and that he intended to comply with the tariff system.

FC's business model was not based on inducing Sancom to breach its tariff. Instead, it was based on its reasonable, credible belief that it was taking advantage of the tariff system within the terms of the law. Under these circumstances, FC was not acting with an improper purpose, because it reasonably believed it was complying with the law as it existed at the time it contracted with Sancom. See Briesemeister v. Lehner, 720 N.W.2d 531, 543-44 (Wis. Ct. App. 2006) (noting defendant did not act with improper motive when it relied on advice of attorney, even if the attorney's advice was incorrect), cited with approval in Selle, 786 N.W.2d at 753. FC's innocent motive distinguishes this case from other cases where the South Dakota Supreme Court found the interferer acted with an improper purpose. See, e.g., St. Onge Livestock Co., Ltd. v. Curtis, 650 N.W.2d 537, 542 (S.D. 2002) (finding issue of material fact on impropriety of interference where party disregarded express advice of counsel about legality of employment contract and recruited competitor's manager).

Judge Murphy argues that the district court committed clear error when it held that FC did not act with improper purpose, based largely on the district court's finding that Erickson was credible when he testified that he did not know FC's business model violated Sancom's tariff and that he intended to comply with the law. First, Judge Murphy argues this credibility finding was internally inconsistent with the district court's finding that FC's business model was "specifically designed" to take advantage of the tariff. Second, Judge Murphy argues Erickson's intent was irrelevant, because FC had actual knowledge it was interfering with Sancom's contract with Qwest.

This argument rests on the flawed premise that FC knew it was acting unlawfully. The FCC's finding that FC designed its business model to take advantage

-9-

of the tariff system does not compel the conclusion that FC knew it was acting unlawfully. There is nothing unlawful about a company acting to take advantage of a favorable regulatory scheme, which FC believed it was doing. While Sancom's billings to Qwest were later deemed "unlawful," this conclusion was not apparent to FC at the time it contracted with Sancom. FC thought its contract with Sancom fit within Sancom's tariff. In hindsight, FC was wrong. But at the time, it did not know it was wrong.

This difference is important, because tortious interference with a business relationship is an intentional tort, and therefore a defendant must *knowingly* interfere with the contract to be liable. Restatement (Second) of Torts § 766 cmt. j. (1979) (noting that element of intent may be satisfied where actor "knows that the interference is certain or substantially certain to occur as a result of his action"). Indeed, in each case Judge Murphy cites the defendant knew its actions would interfere with the plaintiff's business relationship at the time it engaged in the interference. See Lien, 39 N.W.2d at 489 (finding defendant had sufficient intent to interfere with a business relationship where it mined a third party's land even though it had knowledge of plaintiff's contractual rights to the rock on the land); ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op., 276 F.3d 957, 972-73 (8th Cir. 2002) (finding actor acted with sufficient intent for claim of tortious interference where it had knowledge that its accounting advice would undercut the defendant's contractual right to receive royalties). By contrast, FC did not know that its business model would cause Sancom to breach its contract. It simply believed it was taking advantage of the regulatory system. Therefore, FC did not act with an improper motive.

We affirm the district court's judgment that Qwest failed to prove FC acted with an improper purpose.

-10-

## B.     Unfair Competition

Qwest next argues the district court erred when it predicted South Dakota would not recognize FC committed a tort of unfair competition when it induced Sancom to breach its tariff.  When a state's highest court has not spoken on an issue, a federal court must predict what the state court would do if it were called upon to decide the issue.  See Nw. Mut. Life Ins. Co. v. Weiher, 809 F.3d 394, 397 (8th Cir. 2015).

Under South Dakota law, the tort of unfair competition itself does not have specific elements, but rather it describes a general category of torts which courts recognize to protect commercial interests.  Setliff v. Akins, 616 N.W.2d 878, 887-88 (S.D. 2000).  Therefore, to prove the defendant committed the tort of unfair competition, the plaintiff must identify an underlying tortious act the defendant committed.  Id.

To identify an underlying tortious act that FC committed, Qwest points to the Restatement (Third) of Unfair Competition, which provides a remedy in tort for harm that results from the "acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public."  Restatement (Third) of Unfair Competition § 1(a)(3) (1995).  Qwest argues FC's business model was based on tortiously inducing regulatory violations, which falls under this section of the Restatement as an act or practice that South Dakota would determine to be actionable as an unfair method of competition.

We disagree with Qwest that South Dakota would recognize a new tort under these circumstances, because an essential component for a claim of unfair competition under South Dakota law is lacking: direct competition.  South Dakota recognizes the tort of unfair competition when one company gains an upper hand on its competitor

due to an unfair practice. In <u>Raven Industries, Inc. v. Lee</u>, for example, the South Dakota Supreme Court found the defendant committed the tort of unfair competition when it gained a "thirteen-year head start in manufacturing" after it took its competitor's trade secret. 783 N.W.2d 844, 851 (S.D. 2010). Likewise, in <u>Setliff</u>, the court found a triable issue on whether an employee committed the tort of unfair competition when he breached his duty of loyalty and began competing against his former employer. 616 N.W.2d at 887-88. And cases from other jurisdictions on which Qwest relies also involve unfair competition between direct competitors. <u>See</u> <u>ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.</u>, 249 F. Supp. 2d 622, 688-89 (E.D. Pa. 2003) (finding unfair competition where competitor tortiously interfered with contract and gained advantage over direct competitor); <u>N.M. Oncology &</u> <u>Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.</u>, 54 F. Supp. 3d 1189, 1233-37 (D.N.M. 2014) (denying defendant's motion to dismiss claim of unfair competition where hospital used unfair means to drive competitor out of market).

In this case, FC was not a direct competitor of Qwest and it did not use any unfair methods to gain an advantage over Qwest. We therefore predict the South Dakota Supreme Court would not recognize a tort of unfair competition under these circumstances, and we find the district court properly rejected this new tort.

## C.    Unjust Enrichment

Finally, Qwest argues the district court erred when it found FC was not unjustly enriched. Unjust enrichment is an equitable remedy, <u>Dowling Family P'ship v.</u> <u>Midland Farms</u>, 865 N.W.2d 854, 860 (S.D. 2015), and we review a district court's decision to deny an equitable remedy for abuse of discretion. <u>Olivares v. Brentwood</u> <u>Indus.</u>, 822 F.3d 426, 429 (8th Cir. 2016). A district court abuses its discretion if it fails to consider a relevant factor that should have been given significant weight, if it considers an improper or irrelevant factor, or if it "commits a clear error of

judgment in the course of weighing proper factors." Aaron v. Target Corp., 357 F.3d 768, 774 (8th Cir. 2004).

To establish a claim for unjust enrichment, the plaintiff must prove (1) it conferred a benefit upon another; (2) the other accepted or acquiesced in that benefit; and (3) it would be inequitable to allow the other to retain that benefit without paying. Dowling Family P'ship, 865 N.W.2d at 862. "[T]he fact that a benefit is retained, enjoyed, and profitably exploited by the recipient, all without compensation, does not necessarily mean that the recipient has been unjustly enriched." Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. b (2011) (cited with approval in Johnson v. Larson, 779 N.W.2d 412, 416 (S.D. 2010)). Rather, the beneficiary must obtain the benefit "in a manner that the law regards as unjustified." Id. "[T]he relevant inquiry is whether the circumstances are such that equitably the beneficiary should restore to the benefactor the benefit or its value." Hofeldt v. Mehling, 658 N.W.2d 783, 788 (S.D. 2003).

The district court found Qwest did not prove it was entitled to an equitable remedy for unjust enrichment because it would not be inequitable to allow FC to retain the benefit it received. Qwest Commc'ns Corp., 2014 WL 5782543, at *17. The district court noted that FC did not gain any benefit illegally or inequitably – it merely "took advantage of a loophole until the loophole closed." Id. The district court also noted that FC provided legitimate services in exchange for its payments from Sancom. Id. Finally, the district court found it would not be equitable to allow Qwest to recover money from FC when it already recovered money in its settlement with Sancom. Id.

At this stage, this ruling must be vacated. Here the district court relied on two irrelevant factors. First, the district court incorrectly found FC's conduct was "neither illegal nor inequitable" because it was simply taking advantage of a loophole until the loophole closed. Id. The phrase "loophole" implies that the Sancom-FC contract was

-13-

legal prior to the FCC's decision in Farmers II. But that is not the case. In Farmers II, the FCC held that LECs violated the Communications Act by billing IXCs for calls that terminated at conference call bridges when the conference calling company did not subscribe to the LEC's services. Farmers II, 24 F.C.C. Rcd. at 14813. This decision was not merely prospective (that LECs could no *longer* bill IXCs for this traffic) but retrospective as well (that LECs never could have billed IXCs for this traffic). Since these billing practices were never legal, no loophole ever existed.

As such, FC was not exploiting a loophole, but rather taking advantage of legal uncertainty. In other words, while FC did not intend to cause Sancom to breach its tariff, it did, in part, cause Sancom to breach its tariff. This distinction is crucial, because unjust enrichment is appropriate where the beneficiary gains a benefit inequitably, even if the beneficiary does not intend to deprive the benefactor of the benefit. See Johnson, 779 N.W.2d at 417-18 (finding unjust enrichment appropriate even where defendant was not a wrongdoer and had "no intent to deprive" the plaintiff of his benefit). Thus, the fact that FC did not know it was inducing a tariff violation is not a defense to Qwest's claim for unjust enrichment. And even though FC was not itself acting illegally, its conduct might be characterized as inequitable because it retained a benefit based on Sancom's tariff violation, which it partly caused. By finding FC did not act illegally or inequitably because it took advantage of a "loophole," the district court may have relied on an improper factor for its denial of relief.

Second, the district court improperly considered Sancom's settlement payments to Qwest when it found FC was not unjustly enriched. South Dakota measures damages for unjust enrichment based on the amount the beneficiary received unjustly, not the amount the benefactor lost. See Johnson, 779 N.W.2d at 418 ("Unjust enrichment . . . allows an award of restitution for the value of the benefit unjustly received, rather than the value of the services provided."). Since Sancom's payments to Qwest have no effect on the amount by which FC was enriched, this factor is

-14-

legally irrelevant to Qwest's claim for unjust enrichment.[4]  Rather, the focus should have been the amount of money FC inequitably received, not the amount of money Qwest has already recovered from Sancom.  By denying Qwest's claim for unjust enrichment due, in part, to the amount of damages Sancom already paid Qwest, the district court may have given undue weight to another legally irrelevant factor.

Thus, we reverse and remand to the district court for reconsideration of whether FC was unjustly enriched.  We leave the merits of Qwest's claim for unjust enrichment to the district court based on the full record.[5]

## IV.  CONCLUSION

For the foregoing reasons, we conclude the district court properly entered its rulings in favor of FC on Qwest's claims for intentional interference with a business relationship and unfair competition.  However, the district court failed to consider all important factors undergirding the unjust enrichment claim.  We therefore vacate the district court's order on the claim for unjust enrichment and remand to the district court for reconsideration of whether FC was unjustly enriched.

It is so ordered.

---

[4]We leave to the district court to decide whether Sancom's payments to Qwest may diminish Qwest's recovery under any other legal theory.

[5]Judge Shepherd argues FC cannot be said to have gained a benefit inequitably without paying for its value, and therefore it is not liable to Qwest under a theory of unjust enrichment.  That matter goes to the merits, which we leave to the district court.

-15-

SHEPHERD, concurring in part and dissenting in part.

I concur in the court's decision to affirm the district court in denying Qwest's claims for intentional interference with a business relationship and unfair competition. However, I would also affirm the district court's denial of Qwest's unjust enrichment claim.

"'In reviewing a judgment after a bench trial, this court reviews the court's factual findings for clear error and its legal conclusions de novo.'" Tussey v. ABB, Inc., 746 F.3d 327, 333 (8th Cir. 2014) (quoting Outdoor Cent. Inc. v. GreatLodge.com, Inc., 688 F.3d 938, 941 (8th Cir. 2012)). The majority finds that the district court erred in denying Qwest's unjust enrichment claim against FC because FC's conduct was neither illegal or inequitable. The court finds that the Sancom-FC contract was never legal because the FCC decision in Farmers II was retrospective as well as prospective, i.e. that LEC's could never bill IXCs for bridged conference calls. This misses the point. It is undisputed that two separate and distinct contractual relationships existed under the facts of this case. First, Qwest had a contractual relationship with Sancom governed by federal laws and regulations. Charges by Sancom to Qwest are set forth in a tariff which Sancom filed with the FCC and the South Dakota Public Utilities Commission. Money was paid by Qwest to Sancom based upon minutes of use attributable to qualifying "end users" under the tariffs. Second, Sancom and FC entered into a contract under which Sancom agreed to provide FC with a location for a conference call bridge and FC agreed to provide a minimum number of minutes to the bridge in exchange for a marketing fee. Money was paid by Sancom to FC as a per minute marketing fee for call traffic to FC's conference call bridge.

FC was not a party to a contract between Sancom and Qwest and did not participate in the billing relationship between those entities. Nor was FC a party to the FCC proceedings. In Farmers II the FCC, based upon newly presented evidence,

-16-

ruled that conference call customers were not end users or customers under the LEC's tariff and that IXCs such as Qwest were not liable for termination charges with respect to that traffic. However, the FCC exercised no jurisdiction over FC and the written decision does not criticize the motives of FC in entering into the contract with Sancom much less invalidate the contract or opine that it is unenforceable. In this action, the district court found that "FC had no obligations under any tariff because it is not a carrier," "FC was under no legal obligation to ensure that Sancom complied with its tariff," and, "significantly, that FC was not the actor who violated Sancom's tariffs, and therefore FC did not engage in conduct that was actionable under a federal or state statute." Indeed, the majority accurately concludes: "There is nothing unlawful about a company acting to take advantage of a favorable regulatory scheme . . . ." (Supra p. 10.)

Not a party to an illegal agreement and having no legal obligation to ensure that Sancom complied with its tariff, FC can not be said to have received a benefit "'from the plaintiff which would be inequitable to retain without paying for its value'" an essential element of an unjust enrichment action. Apache Corp. v. MDU Res. Grp, Inc., 603 N.W.2d 891, 895 (N.D. 1999) (quoting Zuger v. North Dakota Ins. Guar. Ass'n, 494 N.W.2d 135, 138 (N.D. 1992)). The district court's findings are amply supported by the record and are consistent with the contracts between the parties and the order of the FCC. The decision of the district court to decline this equitable remedy was not an abuse of discretion. Entergy Arkansas, Inc. v. Nebraska, 358 F.3d 528, 554 (8th Cir. 2004) ("We review a decision not to impose a particular equitable remedy for an abuse of discretion.").

I would affirm the district court's judgment in favor of FC on Qwest's unjust enrichment claim.

MURPHY, Circuit Judge, dissenting.

Free Conferencing and Sancom created a scheme by which Free Conferencing generated telephone traffic on Qwest's network, and Sancom then billed Qwest under its FCC approved tariff, and Free Conferencing received part of Sancom's proceeds. On referral the FCC found that Sancom was not entitled to bill Qwest because the Free Conferencing/Sancom arrangement violated federal law. The district court found that Free Conferencing's contract with Sancom was "intentionally designed" to take advantage of Qwest's FCC tariff. The majority nonetheless concludes that Free Conferencing is not liable to Qwest for interfering with the tariff because of its own "innocent motive." That conclusion is contrary to South Dakota law, and its premise conflicts with the facts as found by the FCC. Because Qwest is entitled to recover from Free Conferencing on its claims for tortious interference and unjust enrichment, I respectfully dissent.

I.

In South Dakota, the elements of tortious interference with a business relationship are:

1. The existence of a valid business relationship or expectancy;
2. knowledge by the interferer of the relationship or expectancy;
3. an intentional and unjustified act of interference on the part of the interferer;
4. proof that the interference caused the harm sustained; and,
5. damages to the party whose relationship or expectancy was disrupted.

Selle v. Tozser, 786 N.W.2d 748, 753 (S.D. 2010). Based on the record here the district court found that the tariff "controlled the relationship" between Sancom and Qwest, that Free Conferencing had knowledge of that relationship, and that it had knowledge of Sancom's obligations under the tariff. The question is whether Free

-18-

Conferencing committed an "intentional and unjustified act of interference" with that relationship.

The findings and conclusions made by the FCC in this case should be given significant weight. See United States v. Great N. Ry. Co., 337 F.2d 243, 248 (8th Cir. 1964); MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1103 (3d Cir. 1995); see also Access Telecomms. v. Sw. Bell Tel. Co., 137 F.3d 605, 608 (8th Cir. 1998) (courts apply the doctrine of primary jurisdiction "to obtain the benefit of an agency's expertise and experience"). The FCC found that Sancom "was not entitled to charge Qwest . . . under the Tariff" for Free Conferencing traffic and concluded that its charges to Qwest were unlawful. In re Qwest Commc'ns Co. v. Sancom, Inc. (Sancom), 28 F.C.C.R. 1982, 1994 (2013). The district court found that Free Conferencing's agent Darin Rohead drafted a contract which depended on Sancom violating its tariff obligations with Qwest and making illegal billings to Qwest. This interfered with Qwest's rights under the tariff.

Free Conferencing's actions were intentional. The FCC found that the contract between Free Conferencing and Sancom, which Rohead drafted, appeared to be "purposefully structured" to avoid the tariff, Sancom, 28 F.C.C.R. at 1993, and the district court found that the contract was "intentionally" and "specifically designed to take advantage of the tariff relationship."

Free Conferencing also had no justification for inducing violations of federal law. Free Conferencing knew about the tariff and knew that the consequence of its contract was that Sancom would bill Qwest in a way that violated that tariff. The district court specifically found that Free Conferencing "knew that [its] profit would come at the expense of" Qwest because the latter was "bound to pay a high tariff rate" to Sancom and Free Conferencing's business was "intentionally designed to take advantage of that arrangement." These facts are sufficient to make out a claim for unjustified interference under South Dakota law. "When one has knowledge of the

-19-

contract rights of another, his wrongful inducement of a breach thereof is a willful destruction of the property." Lien v. Nw. Eng'g Co., 39 N.W.2d 483, 486 (S.D. 1949).

The majority concludes that Free Conferencing "did not act with an improper purpose," relying heavily on the testimony of its president, David Erickson claiming that he had intended to act lawfully. Although we give significant deference to a trial court's credibility determinations, we may find clear error when a witness story is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it," or when a court's finding is internally inconsistent with its other findings. Wilson v. Lambert, 789 F.2d 656, 658 (8th Cir. 1986) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985)). The district court's finding that Free Conferencing did not intend to violate the law was flawed for both reasons.

Erickson's testimony directly conflicts with the FCC's finding that the contract was purposefully structured to avoid the tariff relationship. See Sancom, 28 F.C.C.R. at 1993. The FCC examined the contract and found that it "bear[s] no indications that [it] pertain[s] in any way to the services offered under the Tariff" and that it contains provisions which are different from and "inconsistent with" the tariff. The district court found that Free Conferencing "knew about the tariff, its rates, and the obligations of the parties bound by the tariffs." It strains credulity to believe that Free Conferencing intended to act lawfully when it entered into a contract under which it profited from Sancom's unlawful billings to Qwest. Moreover, Erickson's testimony, that he "did not have any motivation to operate his business outside the tariffs" and took steps to comply with the tariff, conflicts with the district court's own finding that the contract was "specifically designed" to take advantage of the tariff. The district court's finding that Free Conferencing had no improper motivation is clearly erroneous because it is internally inconsistent with the court's other findings and contradicts the FCC's factual findings.

Regardless, Erickson's subjective view about the propriety of his company's actions is not relevant to the legal analysis in this case. Under the Restatement approach to tortious interference which South Dakota follows, "even if an actor has a legitimate motive or purpose for its actions, if the actor has knowledge of the consequences of its acts, then it may be liable for tortious interference with contract." ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op., 276 F.3d 957, 972 (8th Cir. 2002) (analyzing North Dakota law and section 766 of the Restatement (Second) of Torts); see Gruhlke v. Sioux Empire Fed. Credit Union, Inc., 756 N.W.2d 399, 406 (S.D. 2008) (noting that South Dakota follows section 766). In South Dakota, when the defendant "has knowledge of the contract rights of another, his wrongful inducement of a breach thereof is a willful destruction of the property of another and cannot be justified on the theory that it enhances and advances the business interests of the wrongdoer." Lien, 39 N.W.2d at 486 (quoting Sorenson v. Chevrolet Motor Co., 214 N.W. 754, 756 (Minn. 1927)). The majority cites no South Dakota case for the proposition that an "innocent motive" provides a defense to a claim of tortious interference if the defendant had actual knowledge that it was interfering with a contract. See id. (defendant liable "even though he promoted his legitimate interests"). Because Free Conferencing had "the requisite knowledge of the inevitable effect" of its own contract with Sancom, it is liable to Qwest. ANR W. Coal Dev. Co., 276 F.3d at 972.

Free Conferencing and Sancom were not "simply attempting to take advantage of the uncertain regulatory scheme at the time" as the majority claims. Rather, their contract involved deliberate avoidance of federal law. Free Conferencing knew about the obligations of the tariff when it created a scheme by which Sancom would pay it for generating calls which Sancom would charge to Qwest even though the calls were not covered by the tariff. The FCC found that "under the agreement, Sancom would pay Free Conferencing a per-minute fee when [Qwest] paid Sancom's related switched access bills." Sancom, 28 F.C.C.R. at 1984. In other words, if Sancom had not breached its tariff and billed Qwest, Free Conferencing would not have gotten

paid. This factual record shows that, contrary to the majority's conclusion, the Free Conferencing business model was in fact "based on inducing Sancom to breach its tariff."

The contract Free Conferencing drafted was premised on a business model that was unlawful at the time. The majority's "legal uncertainty" rationale is belied by its own analysis of the applicable law at the time the contract was drafted. The majority correctly states that the FCC's Farmers II decision was "not merely prospective . . . but retrospective as well," and that under the law as determined by Farmers II "[Sancom] never could have billed [Qwest] for this traffic" because Sancom's billing practices "were never legal." Creating a business model which violates federal law is not "taking advantage of legal uncertainty" if the government has not yet filed an enforcement action against a novel scheme. It is simply unlawful.

II.

I agree that the district court abused its discretion by granting judgment to Free Conferencing on Qwest's unjust enrichment claim. The basis for Free Conferencing's profits under its contract with Sancom was Qwest's tariff payments to Sancom. Free Conferencing was aware of those payments because the district court found it had drafted the contract, knew about the tariff, and that the contract was designed to take advantage of the tariff. For Free Conferencing to retain its share of Qwest's tariff payments would not be equitable because that money was obtained as part of a wilful, unlawful business practice.

The district court relied on the fact that Free Conferencing provided a service to its own customers, and that some of its customers were also Qwest customers. Whether or not Free Conferencing provided its own customers teleconferencing services is irrelevant, because it was providing those services so that it and Sancom could make money from Qwest. The fact that some Free Conferencing customers

-22-

used Qwest's long distance services is also irrelevant, because Sancom was not entitled to bill Qwest for <u>any</u> of the calls going to Free Conferencing. Qwest never received any benefit from Free Conferencing's actions (which in fact cost it millions of dollars). Qwest is entitled to damages on its unjust enrichment claim.

## III.

Because Qwest's claims for tortious interference and unjust enrichment can provide it with adequate remedies, the district court correctly concluded that the South Dakota Supreme Court would not likely recognize the new tort of inducing regulatory violations under the circumstances of this case. <u>See</u> <u>Garrett v. BankWest, Inc.</u>, 459 N.W.2d 833, 842–43 (S.D. 1990). The majority suggests South Dakota courts would never recognize this tort theory, but its conclusion is based on the erroneous premise that Free Conferencing "did not use any unfair methods to gain an advantage over Qwest." On this record it is clear that Free Conferencing's purposeful abuse of the tariff system was unfair to Qwest.

## IV.

Qwest is entitled to recover on its claims for tortious interference and unjust enrichment. I therefore respectfully dissent and would reverse and remand for a calculation of Qwest's damages on these claims.

_____