MURPHY, Circuit Judge,
dissenting.
Free Conferencing and Sancom created a scheme by which Free Conferencing generated telephone traffic on Qwest’s network, and Sancom then billed Qwest under its FCC approved tariff, and Free Confer *902 encing received part of Sancom’s proceeds. On referral the FCC found that Sancom was not entitled to bill Qwest because the Free Conferencing/Sancom arrangement violated federal, law. The district court found that Free Conferencing’s contract with Sancom was “intentionally designed” to take advantage of Qwest’s FCC tariff. The majority nonetheless concludes that Free Conferencing is not liable to Qwest for interfering with the tariff because of its own “innoeent motive.” That conclusion is contrary to South Dakota law, and its premise conflicts with the facts as found by the FCC. Because Qwest is entitled to recover from Free Conferencing on its claims for tortious interference and unjust enrichment, I respectfully dissent.
I.
In South Dakota, the elements of tor-tious interference with a business relationship are:
1. The existence of a valid business relationship or expectancy;
2. knowledge by the interferer of the relationship or expectancy;
3. an intentional and unjustified act of interference on the part of the interferer;
4. proof that the interference caused the harm sustained; and,'
5. damages to the party whose relationship or expectancy was disrupted.
Selle v. Tozser, 786 N.W.2d 748, 753 (S.D. 2010). Based on the record here the district court found that the tariff “controlled the relationship” between Sancom and Qwest, that Free Conferencing had knowledge of that relationship, and that it had knowledge of Sancom’s obligations under the tariff. The question is whether Free Conferencing committed an “intentional and unjustified act of interference” with that relationship.
The findings and conclusions made by the FCC in this case should be given significant weight. See United States v. Great N. Ry. Co., 337 F.2d 243, 248 (8th Cir. 1964); MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1103 (3d Cir. 1995); see also Access Telecomms. v. Sw. Bell Tel. Co., 137 F.3d 605, 608 (8th Cir. 1998) (courts apply the doctrine of primary jurisdiction “to obtain the benefit of an agency’s expertise and experience”). The FCC found that Sancom “was not entitled to charge Qwest ... under the Tariff’ for Free Conferencing traffic and concluded that its charges to Qwest were unlawful. In re Qwest Commc’ns Co. v. Sancom, Inc. (Sancom), 28 F.C.C.R. 1982, 1994 (2013). The district court found that Free Conferencing’s agent Darin Rohead drafted a contract which depended on Sancom violating its tariff obligations with Qwest and making illegal billings to Qwest. This interfered with Qwest’s rights under the tariff.
Free Conferencing’s actions were intentional. The FCC found that the contract between Free Conferencing and Sancom, which Rohead drafted, appeared to be “purposefully structured” to avoid the tariff, Sancom, 28 F.C.C.R. at 1993, and the district court found that the contract was “intentionally” and “specifically designed to take advantage of the tariff relationship.”
Free Conferencing also had no justification for inducing violations of federal law. Free Conferencing knew about the tariff and knew that the consequence of its contract was that Sancom would bill Qwest in a way that violated that tariff. The district court specifically found that Free Conferencing “knew that [its] profit would come at the expense of’ Qwest because the latter was “bound to pay a high tariff rate” to Sancom and Free Conferencing’s business *903 was “intentionally designed to take advantage of that arrangement.” These facts are sufficient to make out a claim for unjustified interference under South Dakota law. “When one has knowledge of the contract rights of another, his wrongful inducement of a breach thereof is a willful destruction of the property.” Lien v. Nw. Eng’g Co., 73 S.D. 84, 39 N.W.2d 483, 486 (1949).
The majority concludes that Free Conferencing “did not act with an improper purpose,” relying heavily on the testimony of its president, David Erickson claiming that he had intended to act lawfully. Although we give significant deference to a trial court’s credibility determinations, we may find clear error when a witness story is “so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it,” or when a court’s finding is internally inconsistent with its other findings. Wilson v. Lambert, 789 F.2d 656, 658 (8th Cir. 1986) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). The district court’s finding that Free Conferencing did not intend to violate the law was flawed for both reasons.
Erickson’s testimony directly conflicts with the FCC’s finding that the contract was purposefully structured to avoid the tariff relationship. See Sancom, 28 F.C.C.R. at 1993. The FCC examined the contract and found that it “bear[s] no indications that [it] pertain[s] in any way to the services offered under the Tariff’ and that it contains provisions which are different from and “inconsistent with” the tariff. The district court found that Free Conferencing “knew about the tariff, its rates, and the obligations of the parties bound by the tariffs.” It strains credulity to believe that Free Conferencing intended to act lawfully when it entered into a contract under which it profited from Sancom’s unlawful billings to Qwest. Moreover, Erickson’s testimony, that he “did not have any motivation to operate his business outside the tariffs” and took steps to comply with the tariff, conflicts with the district court’s own finding that the contract was “specifically designed” to take advantage of the tariff. The district court’s finding that Free Conferencing had- no improper motivation is clearly erroneous because it is internally inconsistent with the court’s other findings and contradicts the FCC’s factual findings.
Regardless, Erickson’s subjective view about the propriety of his company’s actions is hot relevant to the legal-analysis in this case. Under the Restatement approach to tortious interference which South Dakota follows, “even if an actor has a legitimate motive or purpose for its actions, if- the actor has knowledge of the consequences-of its acts, then it may be hable for tortious interference with contract.” ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op., 276 F.3d 957, 972 (8th Cir. 2002) (analyzing North Dakota law and section 766 of the Restatement (Second) of Torts); see Gruhlke v. Sioux Empire Fed. Credit Union, Inc., 756 N.W.2d 399, 406 (S.D. 2008) (noting that South Dakota follows section 766). In South Dakota, when the defendant “has knowledge of the' contract rights of another, his wrongful inducement of a breach thereof is a willful destruction of the property of another and cannot be justified on the theory that it enhances and advances the business interests of the wrongdoer.” Lien, 39 N.W.2d at 486 (quoting Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 756 (1927)). The majority cites no South Dakota case for the proposition that an “innocent motive” provides a defense to a claim of tortious interference if the defendant had actual knowledge that it was interfering with a contract. See id. (defendant liable “even though he promoted his legitimate interests”). Because Free *904 Conferencing had “the requisite knowledge of the inevitable effect” of its own contract with Sancom, it is liable to Qwest. ANR W. Coal Dev. Co., 276 F.3d at 972.
Free Conferencing and Sancom were not “simply attempting to take advantage of the uncertain regulatory scheme at the time” as the majority claims. Rather, their contract involved deliberate avoidance of federal law. Free Conferencing knew about the obligations of the tariff when it created a scheme by which Sancom would pay it for generating calls which Sancom would charge to Qwest even though the calls were not covered by the tariff. The FCC- found that “under the agreement, Sancom would pay Free Conferencing a per-minute fee when [Qwest] paid San-com’s related switched access bills.” Sancom, 28 F.C.C.R. at 1984. In other words, if Sancom had not breached its tariff and billed Qwest, Free: Conferencing would not have gotten paid. This factual record shows that, contrary to the majority’s conclusion, the Free Conferencing business model was in fact “based on inducing San-com to breach its tariff.”’
The contract Free Conferencing drafted was premised on a business model that was unlawful at the time. The majority’s “legal uncertainty” rationale is belied by its own analysis of the applicable law at the time the contract was drafted. The majority correctly states that the FCC’s Farmers II decision was “not merely prospective .., but retrospective as well,” and that under the law as determined by Farmers II “[Sancom] never could have billed [Qwest] for this traffic” because San-com’s billing practices “were never legal.” Creating a business model which violates federal law is not “taking advantage of legal uncertainty” if the government has not yet filed an enforcement action against a novel scheme. It is simply unlawful.
II.
I agree that the district court abused its discretion by granting judgment to Free Conferencing on Qwest’s unjust enrichment claim. The basis for Free Conferencing’s profits under its' contract with Sancom was Qwest’s tariff payments to Sancom, Free Conferencing was aware of those payments because the district court found it had drafted the contract, knew about the tariff, and that the contract was designed to take advantage of the tariff. For Free Conferencing to retain its share of Qwest’s tariff payments would not be equitable because that money was obtained as part of a wilful, unlawful business practice.
The district court relied on the fact that Free Conferencing provided a service to its own customers, and that some of its customers were also Qwest customers. Whether or not Free Conferencing provided its own customers teleconferencing services is irrelevant, because it was providing those services so that it and Sancom could make money from Qwest. The fact that some Free Conferencing customers used Qwest’s long distance services is also irrelevant, because Sancom was not entitled to bill Qwest for any of the calls going to Free Conferencing. Qwest never received any benefit from Free Conferencing’s actions (which in fact cost it millions of dollars). Qwest is entitled to damages on its unjust enrichment claim.
III.
Because Qwest’s claims for tortious interference and unjust enrichment can provide it with adequate remedies, the district court correctly concluded that the South Dakota Supreme Court would not likely recognize the new tort of inducing regulatory violations under the circumstances of this case. See Garrett v. BankWest, Inc., 459 N.W.2d 833, 842-43 (S.D. 1990), The *905 majority suggests South Dakota courts would never recognize this tort theory, but its conclusion is based on the erroneous premise that Free Conferencing “did not use any unfair methods to gain an advantage over Qwest.” On this record it, is clear that Free Conferencing’s purposeful abuse of the tariff system was unfair to Qwest.
IV.
Qwest is entitled to recover on its claims for tortious interference and unjust enrichment. I therefore respectfully dissent and would reverse and remand for a calculation of Qwest’s damages on these claims.